Opinion
WERDEGAR, J.
In 2014, the California Legislature sought to place on the general election ballot a nonbinding advisory question, Proposition 49. The measure would have asked the electorate whether Congress should propose, and the Legislature ratify, a federal constitutional amendment overturning the United States Supreme Court decision Citizens United v. Federal Election Comm’n (2010) 558 U.S. 310 [175 L.Ed.2d 753, 130 S.Ct. 876].
In response to a petition for writ of mandate urging the unconstitutionality of the Legislature’s action, we issued an order to show cause and directed the Secretary of State to refrain from taking further action in connection with placement of Proposition 49 on the ballot. Our action did not rest on a final determination of Proposition 49’s lawfulness. Instead, we concluded “the proposition’s validity is uncertain” and the balance of hardships from permitting an invalid measure to remain on the ballot, as against delaying a proposition to a future election, weighed in favor of immediate relief. (See American Federation of Labor v. Eu (1984) 36 Cal.3d 687, 697 [206 Cal.Rptr. 89, 686 P.2d 609].)
We now resolve the merits of Proposition 49’s constitutionality. We conclude, (1) as a matter of state law, the Legislature has authority to conduct investigations by reasonable means to inform the exercise of its other powers; (2) among those other powers are the power to petition for national constitutional conventions, ratify federal constitutional amendments, and call on Congress and other states to exercise their own federal article V powers (U.S. Const., art. V); (3) although neither constitutional text nor judicial precedent provide definitive answers to the question, long-standing historical practice among the states demonstrates a common understanding that legislatures may formally consult with and seek nonbinding input from their constituents on matters relevant to the federal constitutional amendment process; (4) nothing in the state Constitution prohibits the use of advisory questions to inform the Legislature’s exercise of its article V-related powers; and (5) applying deferential review, Proposition 49 is reasonably related to the exercise of those powers and thus constitutional. We deny the instant petition for a writ of mandate.
*495 Factual and Procedural Background
In Citizens United v. Federal Election Comm’n, supra, 558 U.S. 310, a divided United States Supreme Court invalidated federal election law restrictions on the political speech of corporations, holding that a speaker’s identity as a corporation, as opposed to natural person, could not justify greater regulation of speech than the First Amendment would have otherwise permitted. (Citizens United, at pp. 319, 365.) In the few years since its issuance, Citizens United’s holding concerning the speech rights of corporations has generated considerable democratic debate, receiving criticism in the presidential State of the Union Address,[1] giving rise to resolutions in Congress to amend the Constitution,[2] and sparking calls for reconsideration within the United States Supreme Court itself.[3] Many have agreed with the Supreme Court majority, while others have concluded the Constitution must be amended to permit renewed restraints on corporate involvement in popular elections.
The Legislature first joined issue with Citizens United in Assembly Joint Resolution No. 1, introduced in 2012 and adopted by both houses of the Legislature in 2014. (Assem. Joint Res. No. 1, Stats. 2014 (2013-2014 Reg. Sess.) res. ch. 77.) The resolution declared: “Corporations are legal entities that governments create and the rights that they enjoy under the United States Constitution should be more narrowly defined than the rights afforded to natural persons.” (Ibid.) Acknowledging Citizens United’s holding to the contrary, the resolution exercised the Legislature’s federal constitutional power to “apply to the United States Congress to call a constitutional convention for the sole purpose of proposing an amendment to the United States Constitution that would limit corporate personhood for purposes of campaign finance and political speech and would further declare that money does not constitute speech and may be legislatively limited.” (Assem. Joint Res. No. 1, Stats. 2014 (2013-2014 Reg. Sess.) res. ch. 77; see U.S. Const., art. V [“The Congress ... on the application of the legislatures of two-thirds of the several states, shall call a convention for proposing amendments . . . .”].)
Separately, the Legislature enacted Senate Bill No. 1272 (2013-2014 Reg. Sess.) (Senate Bill No. 1272), “[a]n act to submit an advisory question to the *496 voters relating to campaign finance . . . .” (Stats. 2014, ch. 175.) A lengthy preamble decried Citizens United, noted the article V process for amending the United States Constitution, and asserted ‘“[t]he people of California and of the United States have previously used ballot measures as a way of instructing their elected representatives about the express achons they want to see them take on their behalf, including provisions to amend the United States Constitution.” (Stats. 2014, ch. 175, § 2, subd. (m); see generally id., § 2.) The measure ”call[ed] a special election to be consolidated with the November 4, 2014, statewide general election” (Legis. Counsel’s Dig., Sen. Bill No. 1272 (2013-2014 Reg. Sess.); see Stats. 2014, ch. 175, § 3) and directed the Secretary of State to submit to voters at that election an advisory question asking whether Congress should propose, and the Legislature ratify, a constitutional amendment overturning Citizens United, and thereafter to submit the results to Congress (Stats. 2014, ch. 175, § 4). The measure became law in July 2014, after both houses passed it and the Governor declined to sign or veto it. (See Cal. Const., art. IV, § 10, subd. (b)(3) [authorizing bills to become statutes after gubernatorial inaction].)
Subsequently, then Secretary of State Debra Bowen designated the advisory question Proposition 49 and began preparing ballot materials. The proposition was to read: “ ‘Shall the Congress of the United States propose, and the California Legislature ratify, an amendment or amendments to the United States Constitution to overturn Citizens United v. Federal Election Commission (2010) 558 U.S. 310 [175 L.Ed.2d 753, 130 S.Ct. 876], and other applicable judicial precedents, to allow the full regulation or limitation of campaign contributions and spending, to ensure that all citizens, regardless of wealth, may express their views to one another, and to make clear that the rights protected by the United States Constitution are the rights of natural persons only?’ ” (Stats. 2014, ch. 175, § 4, subd. (a).)
Petitioners Howard Jarvis Taxpayers Association and Jon Coupal (collectively, Howard Jarvis) promptly filed a petition for writ of mandate in the Third District Court of Appeal, seeking to prevent Secretary Bowen from proceeding with placement of Proposition 49 on the November 2014 ballot. A divided Court of Appeal denied relief.
Howard Jarvis next filed an original emergency petition for writ of mandate in this court. After expedited briefing, we issued an order to show cause and stayed Secretary Bowen from taking further actions in connection with Proposition 49 until after a final decision, effectively removing the advisory question from the November 2014 ballot. The order explained, ”[t]ime constraints require the court to decide immediately whether to permit Proposition 49 to be placed on the November 4, 2014, ballot pending final resolution of this matter.” A five-justice majority concluded Proposition 49’s *497 validity was uncertain and the cost of postponing a potentially lawful proposition to a later ballot, a course the Legislature itself had contemplated in an earlier version of the bill,[4] was outweighed by the cost of permitting a potentially invalid proposition to reach the ballot. “ ‘The presence of an invalid measure on the ballot steals attention, time and money from the numerous valid propositions on the same ballot. It will confuse some voters and frustrate others, and an ultimate decision that the measure is invalid, coming after the voters have voted in favor of the measure, tends to denigrate the legitimate use of the initiative procedure.’ (American Federation of Labor v. Eu[, supra,] 36 Cal.3d 687, 691.)”[5]
Our actions in August 2014 resolved whether Proposition 49 could be placed on the November 2014 ballot. Senate Bill No. 1272 directs only placement on that ballot (Stats. 2014, ch. 175, §§ 3-4), and this case is thus technically moot. But whether the Legislature ever has power to place advisory questions on a statewide ballot is important and undecided, and in the event we were to conclude Senate Bill No. 1272 was indeed constitutional, the Legislature could pass an identical measure directing placement of the same advisory question on a future ballot. In response to our order to show cause, Howard Jarvis and real party in interest the state Legislature of California have briefed the larger questions the petition raises: whether legislative advisory questions are ever permissible, and whether in particular Proposition 49 is permissible or should be enjoined from placement on any future statewide ballot. Notwithstanding that the passage of an election cycle has interposed mootness as a potential obstacle to resolving a significant election law issue, we conclude retaining jurisdiction and addressing the merits is the better course here. (See Independent Energy Producers Assn. v. McPherson (2006) 38 Cal.4th 1020, 1024 [44 Cal.Rptr.3d 644, 136 P.3d 178]; Costa v. Superior Court (2006) 37 Cal.4th 986, 994, 1005 [39 Cal.Rptr.3d 470, 128 P.3d 675].)
Discussion
I. Proposition 49 and the State Legislature’s Power to Investigate
Our Constitution vests “[t]he legislative power of this State ... in the California Legislature which consists of the Senate and Assembly . . . .” (Cal. Const., art. IV, § 1.) It is in the nature of state constitutions that they, unlike the federal Constitution, generally do not grant only limited powers. (Marine *498 Forests Society v. California Coastal Com. (2005) 36 Cal.4th 1, 29 [30 Cal.Rptr.3d 30, 113 P.3d 1062].) Consequently, “unlike the United States Congress, which possesses only those specific powers delegated to it by the federal Constitution, it is well established that the California Legislature possesses plenary legislative authority except as specifically limited by the California Constitution.” (Id. at p. 31.) Lying at the core of that plenary authority is the power to enact laws. (California Redevelopment Assn. v. Matosantos (2011) 53 Cal.4th 231, 254 [135 Cal.Rptr.3d 683, 267 P.3d 580].) It has been said that pursuant to that authority, “[t]he Legislature has the actual power to pass any act it pleases,” subject only to those limits that may arise elsewhere in the state or federal Constitutions. (Nougues v. Douglass (1857) 7 Cal. 65, 70.)
Although the Legislature notes in passing that Proposition 49 resulted from a statute, it does not rest its argument for constitutionality on the syllogism that the legislative power includes the power to enact statutes, Senate Bill No. 1272 takes the form of an enacted statute, and thus for that reason alone the bill and Proposition 49 are within a constitutional source of power. Instead, the Legislature argues it has the inherent power to conduct an investigation in order to select the wisest policy course. Pursuant to that implied investigative power, the Legislature contends, it may enact a statute placing an advisory question before the voters.[6]
We have since the early days of statehood recognized the act of creating a legislature imbues that body with certain implied authority characteristic of parliaments: “A legislative assembly, when established, becomes vested with all the powers and privileges which are necessary and incidental to a free and unobstructed exercise of its appropriate functions. These powers and privileges are derived not from the Constitution; on the contrary, they arise from the very creation of a legislative body, and are founded upon the principle of self preservation.” (Ex parte D. O. McCarthy (1866) 29 Cal. 395, 403.) The scope and nature of these powers is “to be ascertained by a reference to the common parliamentary law.” (Ibid.) Many or most of a parliament’s common law powers relate to matters of self-regulation, such as determining membership and establishing internal rules of procedure (see id. at pp. 403-04), and are not relevant here. One, however, is: the inherent power “[t]o investigate, by the testimony of witnesses or otherwise, any subject or matter, in reference to which [a legislature] has power to act.” (Id. at p. 404, italics omitted.)
*499 The principal function of a legislature is “to enact wise and well-formed and needful laws” (In re Battelle (1929) 207 Cal. 227, 240 [277 P. 725]), but a legislature cannot exercise sound judgment without information. Accordingly, “the necessity of investigation of some sort must exist as an indispensable incident and auxiliary to the proper exercise of legislative power.” (Id. at p. 241; see Special Assembly Int. Com. v. Southard (1939) 13 Cal.2d 497, 503 [90 P.2d 304] [the power to enact legislation “ ‘necessarily presupposes that the members of each house of the legislature must investigate the necessity for legislation’ ”].) The details of how this implied power is to be exercised are consigned to the Legislature’s discretion in the first instance: “ ‘The ascertainment of pertinent facts for legislation is within the power of the lawmaking department of government. When a legislative body has a right to do an act it must be allowed to select the means within reasonable bounds.’ ” (Parker v. Riley (1941) 18 Cal.2d 83, 91 [113 P.2d 873]; see also id. at p. 90 [“Intelligent legislation upon the complicated problems of modern society is impossible in the absence of accurate information on the part of the legislators, and any reasonable procedure for securing such information is proper.”].)
The investigative power is not unlimited. While the Legislature’s powers and functions are extensive (see Carmel Valley Fire Protection Dist. v. State of California (2001) 25 Cal.4th 287, 299 [105 Cal.Rptr.2d 636, 20 P.3d 533]), they must share space with powers reserved to the executive and judicial branches. Although the Legislature’s activities can overlap with the functions of other branches to an extent, the Legislature may not use its powers to “defeat or materially impair” the exercise of its fellow branches’ constitutional functions, nor “intrude upon a core zone” of another branch’s authority. (Marine Forests Society v. California Coastal Com., supra, 36 Cal.4th at p. 45.) The investigative power, no less than any other, may not be used to trench upon matters falling outside the legislative purview.
Even aside from separation of powers concerns, the investigative power permits inquiry only into those subjects “in reference to which [the Legislature] has power to act.” (Ex parte D. O. McCarthy, supra, 29 Cal. at p. 404, italics omitted.) Investigation is permitted as a necessary aid to the execution of other legislative powers, not as an expansion of matters with respect to which the Legislature may act. Where those other powers are subject to limit, so too an investigation in support of them may be constrained. (See Special Assembly Int. Com. v. Southard, supra, 13 Cal.2d at p. 504 [“ ‘when the power to legislate ceases, then the power to investigate for the purpose of aiding the legislature in exercising this power ceases, or stated another way, when the main power of legislating dies the incidental or implied power dies with it’ ”].) The investigative power, constitutionally implied as necessary for the execution of the Legislature’s other powers, does not stand as an unbounded, freestanding power in its own right.
*500 Finally, while the method of investigation is for the Legislature to choose in its broad discretion, within reason (Parker v. Riley, supra, 18 Cal.2d at pp. 90-91), we do not foreclose the possibility limits may arise from other constitutional provisions and the values they embrace.
Given these constraints, to determine whether a particular legislative action is authorized as an exercise of investigative power, we must in the first instance ascertain whether a nexus exists between the matter investigated and some potential action the Legislature has authority to undertake. Senate Bill No. 1272 seeks to conduct a statewide plebiscite on a proposed federal amendment and deliver its results to Congress. (Id., § 4, subds. (a), (b).) The Legislature contends the plebiscite should be understood as part of an investigation into how and whether to exercise the Legislature’s powers in connection with a potential future federal constitutional amendment. Accordingly, we examine next the extent of the role the federal Constitution contemplates for state legislatures in the amendment process.
II. State Legislatures and Federal Constitutional Amendment
The federal Constitution vests state legislatures with certain powers and duties in connection with amendments to the federal Constitution. (See U.S. Const., art. V (article V).) Article V provides in relevant part: “The Congress, whenever two-thirds of both houses shall deem it necessary, shall propose amendments to this Constitution, or on the application of the legislatures of two-thirds of the several states, shall call a convention for proposing amendments, which, in either case, shall be valid to all intents and purposes, as part of this Constitution, when ratified by the legislatures of three-fourths of the several states, or by conventions in three-fourths thereof, as the one or the other mode of ratification may be proposed by the Congress . . . .” This “unwieldy and cumbrous machinery” (Barron v. The Mayor and City Council of Baltimore (1833) 32 U.S. 243, 250 [8 L.Ed. 672]) for altering the Constitution involves a two-stage process—proposal and ratification—with two paths available at each stage. In the first stage, proposal, either Congress or a national convention called for the purpose may propose an amendment or amendments. In the second stage, ratification, a supermajority of the several states, either through their legislatures or state conventions, must approve the proposal for it to become law. (See United States v. Sprague (1931) 282 U.S. 716, 730 [75 L.Ed. 640, 51 S.Ct. 220]; Bramberg v. Jones (1999) 20 Cal.4th 1045, 1056 [86 Cal.Rptr.2d 319, 978 P.2d 1240].)
The Constitution identifies two explicit roles for state legislatures, one at each stage. At the proposal stage, a state legislature may apply to Congress for the calling of a national convention. (See, e.g., Sen. Joint Res. No. 23, *501 Stats. 1935 (1935 Reg. Sess.) res. ch. 145, pp. 2713-2714 [calling for a convention to adopt a federal amendment permitting congressional regulation of intrastate commerce]; Sen. Joint Res. No. 25, Stats. 1911 (1911 Reg. Sess.) res. ch. 73, pp. 2183-2184 [calling for a convention to adopt a federal amendment providing for the direct election of senators].) At the ratification stage, if Congress chooses the legislative ratification route, a state legislature may assent to, or reject, an amendment. (Hawke v. Smith, No. 1 (1920) 253 U.S. 221, 226-228 [64 L.Ed. 871, 40 S.Ct. 495]; see, e.g., Sen. Joint Res. No. 22, Stats. 1971 (1971 Reg. Sess.) res. ch. 45, pp. 4161-4162 [ratifying the 26th Amend.].) All but one of the 15 amendments to the federal Constitution adopted since California’s statehood have been submitted to state legislatures for approval.
If instead Congress chooses the state convention ratification route, as it did for the Twenty-first Amendment repealing Prohibition, state legislatures may still assume a role. Article V conveys power as much through “what is reasonably implied” as through “what is expressed.” (Dillon v. Gloss (1921) 256 U.S. 368, 373 [65 L.Ed. 994, 41 S.Ct. 510].) It grants to Congress and state legislatures those powers “necessary and incidental” to the carrying out of explicitly required tasks. (State ex rel. Donnelly v. Myers (1933) 127 Ohio St. 104 [186 N.E. 918]; see Dillon, at pp. 373-376; State ex rel. Tate v. Sevier (1933) 333 Mo. 662 [62 S.W.2d 895, 898].)[7] When Congress submitted the repeal of Prohibition to state conventions, state legislatures were implicitly charged with establishing the mechanics of the conventions. (State ex rel. Tate, at p. 898; State ex rel. Donnelly, at p. 918.) Legislatures across the country enacted legislation establishing how delegates were to be chosen and when and where conventions would meet. (Brown, Ratification of the Twenty-first Amendment to the Constitution of the United States (1938) pp. 521-700 [collecting laws]; see Stats. 1933, ch. 149, pp. 598-602 [establishing the procedures for Cal.’s convention to ratify the 21st Amend. to the U.S. Const.].)
The several states have never successfully called for a constitutional convention. To date, each of the 27 federal amendments is the product of a proposal by Congress. But this does not mean state legislatures can play no part until ratification. Legislatures are instituted with the inherent power to issue resolutions (Jefferson, A Manual of Parliamentary Practice (1st ed. 1801) § XXI), statements that “declare[] policy or entreat[] action” but without the binding force of law (American Federation of Labor v. Eu, supra, *502 36 Cal.3d at p. 712). From the earliest days of the Republic, state legislatures have used that authority to press Congress to wield its own article V proposal power. Unlike the convention power, these resolutions have proven instrumental in reshaping the federal Constitution through amendment; beginning with the very first post-Bill of Rights amendment, one can find their influence underlying the Constitution’s evolution.[8]
In 1793, the legislatures of Massachusetts and Virginia passed resolutions appealing to their representatives in Congress for a constitutional amendment overturning the United States Supreme Court’s narrow construction of state sovereign immunity in Chisholm v. Georgia (1793) 2 U.S. 419 [1 L.Ed. 440, 2 Dall. 419]. (See New Hampshire v. Louisiana (1883) 108 U.S. 76, 88 [27 L.Ed. 656, 2 S.Ct. 176] [Mass. res.]; Florida v. Georgia (1855) 58 U.S. 478, 519-520 [15 L.Ed. 181] (dis. opn. of Campbell, J.) [Va. res.].) Senator Caleb Strong of Massachusetts responded by moving that Congress propose such an amendment (Florida v. Georgia, at p. 520; 4 Annals of Cong. (3d Cong. 1794) pp. 25, 29-30), and the first post-Bill of Rights amendment was ratified in 1795 (U.S. Const., 11th Amend.). Similar resolutions preceded the Twelfth Amendment, ratified in 1804. (See 13 Annals of Cong. (7th Cong. 1st Sess. 1802) pp. 95-96 [Mass. res.]; 11 Annals of Cong. (8th Cong., 1st Sess., 1803) pp. 509, 602-603, 1285 [N.Y. res.]; id. at p. 629 (1802) [N.C. res.]; id. at p. 472 (1802) [Vt. res.].)
Aside from changes wrought by the Civil War, the Constitution remained static for the next century, but when the next wave of changes came, state legislative resolutions were again at the forefront. California’s Legislature first urged the direct election of senators to Congress in 1874, and did so again in 1893 and 1900.[9] Numerous other states took similar action; by 1896, the Idaho, Indiana, Iowa, Kansas, Ohio, Oregon, Wisconsin and Wyoming *503 Legislatures had joined California in instructing their congressional representatives in favor of pursuing a federal amendment. (Sen. Rep. No. 54-530, 1st Sess., p. 9 (1896).) Ultimately, dozens of states would join the chorus. (See Hall, The History and Effect of the Seventeenth Amendment (1936) pp. 221-223, 512-528; Haynes, The Election of Senators (1906) pp. 108-109.) These pleas spurred action in both houses of Congress. (See, e.g., Ames, The Proposed Amendments to the Constitution of the United States During the First Century of Its History (1897) pp. 61-62 [noting the House of Representatives’ passage of a proposed amendment as a response to repeated state legislative resolutions requesting one]; 45 Cong. Rec. 7109-7112 (1910) [introduction of proposed amend, by Sen. Owen of Okla. following a resolution from his state legislature requesting one].) By 1913, direct election of senators was a part of the federal Constitution. (U.S. Const., 17th Amend.)
State resolutions calling for a congressionally proposed federal amendment also preceded the Nineteenth Amendment, which extended suffrage to women. (O’Connor, The History of the Women’s Suffrage Movement (1996) 49 Vand. L.Rev. 657, 667.) The same was true in advance of the Twenty-first Amendment, repealing Prohibition. (E.g., 1931 Conn. Pub. Acts 285.)
State pressure for constitutional change fails far more than it succeeds. Over the years, state legislatures have submitted thousands of resolutions, but Congress has proposed only a few dozen amendments. For example, state legislatures disturbed by the United States Supreme Court’s reapportionment decisions[10] responded with a mixture of article V convention calls and state resolutions requesting that Congress itself propose a federal amendment restoring to the states broad power over apportionment. Ten states asked for Congress to propose an amendment, while one dozen exercised their own power to call for a convention. (Kyvig, Explicit & Authentic Acts (1996) p. 374 & fn. 14.) Ultimately, no amendment emerged from Congress, and an insufficient number of convention calls were submitted to require a national convention.
As the successful Seventeenth Amendment movement and unsuccessful reapportionment movement demonstrate, the use of a direct convention call and an entreaty to Congress to propose an amendment are not mutually exclusive approaches. Just as different state legislatures may elect one route *504 or the other to constitutional change, so a particular state legislature may prefer a multifront approach and take both paths simultaneously. For example, in June 1935, with the country in the throes of the Depression, the Legislature concluded reform of federal securities and bonds taxation to ensure wealthy stock- and bondholders bore a greater share of the costs of government was urgently needed. The Legislature passed a resolution calling on Congress to propose a federal amendment limiting tax exemptions for these forms of property. (Sen. Joint Res. No. 21, Stats. 1935 (1935 Reg. Sess.) res. ch. 108, p. 2669.) Within weeks, it also used its direct federal power to call for a constitutional convention on the same subject. (Sen. Joint Res. No. 22, Stats. 1935 (1935 Reg. Sess.) res. ch. 144, pp. 2712-2713.)
III. The Use of Advisory Questions to Facilitate the Exercise of Article V-related Powers
Text and tradition thus firmly establish a state legislature’s power to petition for and participate in federal constitutional change, by proposing a national convention for the consideration of an amendment, by issuing a resolution calling on Congress to itself propose an amendment, by deciding whether to ratify amendments that emerge from either of these paths, and by establishing ground rules in the event ratification is to be by state convention. If a state legislature can exercise these powers, that a legislature can also avail itself of implied investigative powers to explore the wisdom or desirability of choosing one or another course of action necessarily follows. (See Parker v. Riley, supra, 18 Cal.2d at pp. 90-91; In re Battelle, supra, 207 Cal. at pp. 240-241.)
As noted, however, the state law investigative power is not unbounded. Any investigation must be tethered to the exercise of other established legislative powers, and the method chosen in a particular instance must be reasonable. The issue we face is whether the Legislature may pose to the electorate a single advisory question concerning the People’s support for a federal constitutional amendment. Its resolution depends on the answer to two subquestions. First, in the abstract, does anything in the text or structure of the state or federal Constitutions preclude the Legislature from posing an advisory question when exercising its own article V authority or entreating other bodies with article V authority (Congress and fellow state legislatures) to act?[11] Second, if there is no bar, is the specific question before us today, Proposition 49, a reasonable exercise of that implied state investigative power?
*505 A. The Role in a Republic of Representative Consultation with the People
The texts of the state and federal Constitutions are silent on the issue we face. The state investigative power is, as we have discussed, an inherent but implicit power of a legislature. The state Constitution does not otherwise clearly address the matter. The federal Constitution is even more terse: “As a rule the Constitution speaks in general terms, leaving Congress to deal with subsidiary matters of detail as the public interests and changing conditions may require; and Article V is no exception to the rule.” (Dillon v. Gloss, supra, 256 U.S. at p. 376, fn. omitted.) Regarding what state legislatures may do when carrying out their article V roles, the federal Constitution leaves the scope of the powers and their limits unarticulated.
As for precedent, in our past decisions elucidating the constitutional principles that govern legislative investigations we have not been called upon to determine whether the investigative power may include the enactment of a statute placing an advisory measure on the statewide ballot. (Cf. Parker v. Riley, supra, 18 Cal.2d at p. 91 [approving formation of an independent commission]; In re Battelle, supra, 207 Cal. at p. 241 [approving formation of investigative committees]; Ex parte D. O. McCarthy, supra, 29 Cal. at p. 404 [approving summoning of witnesses].)
Where neither text nor precedent affords guidance, sometimes a “page of history is worth a volume of logic.” (New York Trust Co. v. Eisner (1921) 256 U.S. 345, 349 [65 L.Ed. 963, 41 S.Ct. 506] (maj. opn. of Holmes, J.); see Dyer v. Blair (N.D.Ill. 1975) 390 F.Supp. 1291, 1303-1307 [looking to historical practice to understand the proper scope of state legislative power in connection with federal constitutional amendments].) The history of legislative consultation with the people, and in particular the historical use of advisory questions to inform judgments concerning federal constitutional matters, is illuminating here.
In 1721, noted British Whig and republican Thomas Gordon, writing pseudononymously as Cato, declared: “[T]he difference between free and enslaved countries lies principally here, that in the former, their magistrates must consult the voice and interest of the people; but in the latter, the private will, interest, and pleasure of the governors, are the sole end and motives of their administration.” (1 Trenchard & Gordon, Cato’s Letters (Hamowy edit., 1995) No. 38 (July 22, 1721) The Right and Capacity of the People to Judge of Government (Gordon) p. 272 (Cato’s Letters).)[12] The seeds of a practice of *506 consultation, the nonbinding solicitation of the people’s views to inform legislative judgments on significant matters, were planted in England in the 17th century. Initially, at least, the practice focused as much on the shaping of public opinion as its solicitation: “With the development of popular sovereignty in the 1640s, various members of Parliament opened communications with constituents to gain popular support for Parliamentary measures directed against the King.” (Morgan, Inventing the People (1988) p. 220.) By the 18th century, however, a more genuine interest in popular views could be found; members of the House of Commons “often” would delay action “until they had consulted their constituents.” (Gibbons, Ideas of Political Representation in Parliament 1651-1832 (1914) p. 25; see 1 Cato’s Letters, at p. 271 [“[Ojur records afford instances, where the House of Commons have declined entering upon a question of importance, till they had gone into the country, and consulted their principals, the people: So far were they from thinking that private men had no right to meddle with government.”].)
Consultation shortly took root in the colonies and soon became “much more an American technique than a British one.” (Reid, The Concept of Representation in the Age of the American Revolution (1989) p. 86.) In New York and Massachusetts, consultation flourished; occasionally it was resorted to even in other colonies such as Pennsylvania that did not have an established town meeting structure through which to assess the popular will. (Id. at pp. 86-95.) When the Continental Congress was faced with its most momentous decision in the spring of 1776, it did not act unilaterally, but instead “delayed its vote on Independence by three weeks ‘to give an Oppertunity [s/c] to the Delegates from those Colonies, which had not yet given Authority to adopt this decisive Measure, to consult their Constituents.’ ” (Maier, American Scripture: Making the Declaration of Independence (1997) p. 67 [quoting a letter from Maryland’s congressional representatives]; see Kruman, Between Authority & Liberty (1997) p. 77.) Maryland’s delegates desired “ ‘the fair and uninfluenced Sense of the People’ on Independence” and asked their colonial assembly to “ ‘endeavour to collect the opinion of the people at large in some Manner or other.’ ” (Maier, at p. 67.) So too Massachusetts; there, the colonial assembly asked every town to hold a special meeting, debate whether to declare independence, and advise its representatives where its people stood. (Id. at p. 59; see Luce, Legislative Principles (1930) p. 570; Reid, at p. 102.) And in 1780, New York’s assembly sought popular instruction concerning whether to draft a colonial constitution. (Kruman, Between Authority & Liberty, supra, at p. 77.) Pre-constitutional America thus had an established tradition whereby the people’s representatives could, if they so chose, solicit the people’s views to inform momentous decisions.
*507 The framers of the federal Constitution likewise accorded the people’s views a foundational role. (See The Federalist No. 22, supra, at p. 146 (Hamilton) [the consent of the people is the “pure original fountain of all legitimate authority”]; The Federalist No. 49, supra, at p. 339 (Madison) [“the people are the only legitimate fountain of power”].) The First Amendment, Virginia Representative James Madison explained, ensured “the people may therefore publicly address their representatives[,] may privately advise them, or declare their sentiments by petition to the whole body; in all these ways they may communicate their will.” (1 Annals of Cong. (1st Cong. 1789) p. 766.) These popular views, Alexander Hamilton wrote, should matter (up to a point): “The republican principle demands, that the deliberate sense of the community should govern the conduct of those to whom they entrust the management of their affairs; but it does not require an unqualified complaisance to every sudden breese of passion, or to every transient impulse which the people may receive from the arts of men, who flatter their prejudices to betray their interests.” (The Federalist No. 71, supra, at p. 482 (Hamilton).) The opinion of Thomas Gordon as Cato that in a free nation representatives could and should “ ‘consult the Voice and Interest of the People’ ” was one “[a]ll [the Founders] could agree with.” (1 The Founder’s Constitution (Kurland & Lerner edits., 1987) p. 41.) The founding generation gave proof of their principles when they submitted the Constitution, not to the state legislatures, but to popular conventions for ratification. (U.S. Const., art. VII; see The Federalist No. 43, supra, at p. 296 (Madison) [“The express authority of the people alone could give due validity to the Constitution.”]; Remarks of Col. Mason, 2 Records of the Federal Convention of 1787, supra, at p. 88 [the Constitution must be submitted “[t]o the people with whom all power remains that has not been given up in the Constitutions derived from them”].)
Although this history does not clearly delineate the permissible means of formal consultation, it reflects an implicit understanding that republican principles generally permit representatives to inquire of the people on fundamental matters. Consistent with that understanding, for more than a century, states have employed the particular means at issue here—an advisory ballot question—to inform decisions concerning federal constitutional matters.
Until adoption of the Seventeenth Amendment, the federal Constitution vested the selection of senators in state legislatures. (See U.S. Const., art. I, § 3.) By the late 19th century many states, especially in the Midwest and West, were inclined to transfer that power to the people themselves. (1 Haynes, The Senate of the United States: Its History and Practice (1938) pp. 96-104; Rossum, California and the Seventeenth Amendment in The California Republic (Janiskee & Masugi edits., 2004) pp. 83-85.) In 1891, our Legislature placed on the next year’s general election ballot an advisory *508 question, asking the voters whether they were for, or against, “ ‘the election of United States Senators by the direct vote of the people,’ ” with the results to be submitted to the President, Congress, and every state in the Union. (Stats. 1891, ch. 48, p. 46.) The result was a landslide; better than 93 percent of those casting ballots favored direct election. (Rossum, at p. 84; Hall, The History and Effect of the Seventeenth Amendment, supra, at p. 230.) So informed, the Legislature requested that California’s senators and representatives propose a constitutional amendment providing for the direct election of senators. (Assem. Joint Res. No. 7, Stats. 1893 (1893 Reg. Sess.) res. ch. 15, p. 620.)
Nevada in 1893 and Illinois in 1902 followed suit. The Nevada Legislature, viewing it as “expedient that the wishes of the people of this State upon the subject of the election of United States Senators should be unmistakably expressed” (1893 Nev. Stat. 21-22), placed on the ballot an advisory question and forwarded the results (nearly eight to one in favor of amendment) to Congress and other states’ Governors (id., p. 22; Haynes, The Election of Senators, supra, at pp. 106, 110). Illinois’s Legislature sought general constitutional guidance, asking the polity whether “ ‘the next General Assembly [should] take the necessary steps, under Article 5 of the Constitution of the United States, to bring about the election of United States Senators by the direct vote of the people?’ ” (Haynes, at p. 110, fn. 10.) Guidance it got; by a nearly six-to-one margin, voters favored legislative efforts to bring about a federal amendment. (Id. at p. 106.) So advised, the next year the Illinois Legislature petitioned for a national constitutional convention. (See id. at p. 108.)
Prior to ratification of the Seventeenth Amendment, our Legislature turned again to the advisory question mechanism to obtain advice on whom to select for the Senate under its not-yet-superseded federal power to choose senators. (Stats. 1909, ch. 405, § 2, p. 691 [providing for an “advisory vote for the purpose of ascertaining the sentiment of the voters” concerning senatorial candidates]; Stats. 1911, ch. 387, § 1, pp. 704-705 [directing that future general election ballots include the names of party candidates for Sen., with results of the advisory referenda to be forwarded to the Leg.].) Here, California was following the lead of the many other legislatures that saw fit to inform their exercise of their federal power to choose senators through advisory plebiscites. Nebraska was the first state to adopt this course, in 1875 (Kyvig, Explicit & Authentic Acts, supra, at p. 210); in 1899, the Nevada Legislature adopted an advisory procedure essentially identical to what California later enacted (1899 Nev. Stat. 86-87); and by 1911, more than half of all states had some form of advisory plebiscite in place (Kyvig, at p. 210; see generally Haynes, The Election of Senators, supra, at pp. 140-150).
*509 In the 1920s and 1930s, as discontent over Prohibition grew, many state legislatures submitted to the people advisory questions asking whether the Eighteenth Amendment should be repealed. The Rhode Island Legislature declared it “proper and desirable that each qualified elector should be permitted to exercise his constitutional right to register his opinion on this broad social and economic question” and directed that the results be sent to Congress. (1930 R.I. Acts & Resolves 63-64.) The people of Rhode Island favored, by more than three to one, constitutional change. (Assn. Against the Prohibition Amendment, 32 Reasons for Repeal (1932) p. 34.) The results were the same in Wyoming, where the legislature solicited the electorate’s views and ordered the secretary of state to transmit the results to Congress (1931 Wyo. Sess. Laws 249); better than 70 percent favored a constitutional amendment (Ann. Rep. of the President of the Association Against the Prohibition Amendment for the Year 1932 (1933) p. 12). Similar votes took place across the country. (See, e.g., 1931 Conn. Pub. Acts 285-286 [petitioning Cong, for repeal of the 18th Amend., subject to the electorate in an advisory vote signaling its desire for an amendment]; 1932 La. Acts 767 [submitting to an advisory vote a joint resolution petitioning Cong, to call a constitutional convention to repeal or modify Prohibition]; 1925 Nev. Stats. 358 [calling for a constitutional convention in the wake of a landslide pro-repeal advisory vote]; 32 Reasons for Repeal, at p. 34 [cataloguing the results of these and other advisory votes]; Ann. Rep. of the President, at pp. 9-12 [same].) Repeal followed anon, proposed by Congress and ratified by the end of 1933. (U.S. Const., 21st Amend.)
More recently, the Llorida Legislature placed on the ballot two advisory questions asking whether the people supported federal constitutional amendments to prohibit forced busing and permit school prayer. (1972 Lla. Laws 114-115.) And in 2010, the Florida Legislature applied to Congress for the calling of a constitutional convention to propose a balanced budget amendment (Lla. Sen. Conc. Res. No. 10 (2010); see 160 Cong. Rec. S5563-S5564 (daily ed. Sept. 11, 2014)) and again placed on a subsequent general election ballot a nonbinding advisory question asking whether the federal Constitution should “be amended to require a balanced federal budget without raising taxes?” (Lla. Sen. Bill No. 2742 (2010 Reg. Sess.) § 1).
State legislatures have also seen fit to resort to advisory questions when debating whether to ratify a proposed amendment. In the 1920s, Congress sent to the states an amendment overturning United States Supreme Court decisions limiting Congress’s regulatory power over child labor. (H.J.Res. No. 184, 68th Cong., 1st Sess. (1924) 43 Stat. 670; see Child Labor Tax Case (1922) 259 U.S. 20 [66 L.Ed. 817, 42 S.Ct. 449]; Hammer v. Dagenhart (1918) 247 U.S. 251 [62 L.Ed. 1101, 38 S.Ct. 529].) Before acting, the Massachusetts legislature submitted the question of ratification to an advisory vote of the people. (Kyvig, Explicit & Authentic Acts, supra, at p. 259.) *510 In the 1970s, the Nevada Legislature had before it the proposed Equal Rights Amendment; as had Massachusetts a half-century earlier, it turned first to the electorate, asking voters whether they ‘“recommend[ed] that the Nevada legislature ratify” the proposed amendment. (1977 Nev. Stat. 322; see Kimble v. Swackhamer (1978) 439 U.S. 1385, 1386 [58 L.Ed.2d 225, 99 S.Ct. 51].) Contemporaneously, the Idaho Legislature adopted a rule that it would act on proposed federal amendments only after obtaining the results of a nonbinding popular vote on any proposed amendment. (Idaho Code former § 34-2217, repealed by 1995 Idaho Sess. Laws, ch. 227, § 1.) When the Twenty-seventh Amendment, regulating congressional salaries, was up for consideration in 1988, the legislature put the matter to a vote and, after the electorate strongly supported it, ratified the amendment. (Kyvig, at p. 466; Bernstein, The Sleeper Wakes: The History and Legacy of the Twenty-seventh Amendment (1992) 61 Fordham L.Rev. 497, 539.)
When contested, these actions have been upheld. California’s provision for including an advisory senatorial vote on primary election ballots was challenged as violating the one-subject rule because it was adopted as part of an act also regulating binding, not merely advisory, primary voting. (Socialist Party v. Uhl (1909) 155 Cal. 776, 781 [103 P. 181]; see Cal. Const., art. IV, § 9 [one-subject rule].) In the course of rejecting the challenge, this court held: “There is nothing in the constitution—either the amendment of [former] section 2½ of article II, or any other provision—which prohibits the legislature from providing at a primary for an expression of a choice as to a candidate for United States senator. It is within the general legislative power to do so, and that it has provided for this advisory vote at a primary election is for the purpose of convenience” and sufficiently germane to the subject of primary elections. (Socialist Party, at p. 782.) We considered “whether legislation in connection with primary laws granting such right of expression of a choice is prohibited by the constitutional provision particularly under consideration [relating to the one-subject rule], or any other” and concluded it was not. (Ibid., italics added.)
The Nevada Supreme Court rejected a federal constitutional challenge to the Nevada Equal Rights Amendment vote, explaining that the advisory question was not “a limitation on legislative power violative of article V of the federal constitution” but instead “simply specifie[d] a means by which to assist the legislature whether to consent or not to consent to the proposed amendment.” (Kimble v. Swackhamer (1978) 94 Nev. 600 [584 P.2d 161, 162-163].) Then Justice Rehnquist, acting as circuit justice, rejected an application for summary reversal of this decision, agreeing that the advisory question posed no article V problem: “Under the Nevada statute in question, ratification will still depend on the vote of the Nevada Legislature, as provided by Congress and by Art. V. I would be most disinclined to read either Hawke, supra, [253 U.S. 221,] or Leser [v. Garnett (1922) 258 U.S. 130 *511 [66 L.Ed. 505, 42 S.Ct. 217]], or Art. V as ruling out communication between the members of the legislature and their constituents.[13] If each member of the Nevada Legislature is free to obtain the views of constituents in the legislative district which he represents, I can see no constitutional obstacle to a nonbinding, advisory referendum of this sort.” (Kimble v. Swackhamer, supra, 439 U.S. at pp. 1387-1388.) Kimble suggests, at a minimum, “there are at least some circumstances in which the submission of a ballot proposition relating to an amendment to the federal Constitution will not violate Article V” and establishes that article V does “not completely foreclose[] a state’s electorate from contributing some input to the amendment process.” (Bramberg v. Jones, supra, 20 Cal.4th at p. 1058; see American Federation of Labor v. Eu, supra, 36 Cal.3d at p. 707 [a popular initiative proposing in nonbinding fashion a federal amendment would raise no art. V issues].)
In 1986, the Idaho Attorney General considered the constitutionality of the then extant Idaho requirement that decisions whether to ratify federal amendments be deferred until after a nonbinding advisory referendum. (See Idaho Code former § 34-2217, repealed by 1995 Idaho Sess. Laws, ch. 227, § 1.) The Attorney General did not doubt that state legislatures could voluntarily submit nonbinding advisory questions concerning federal constitutional amendments to the electorate in individual cases; the legislature could choose to follow a “referendum first, legislative decision second” rule. The only potential problem with the advisory vote law involved its attempt to constrain future legislatures; that is, while any legislature in its discretion could decide to pose an advisory question before voting on ratification, the current state legislature could not mandate that future legislatures be required to do so. (Ops. Idaho Atty.Gen. No. 86-9 (1986).)
B. Advisory Questions and State Constitutional Limits
Legislatures in California and elsewhere thus have established a tradition of using advisory ballot measures to determine the will of the people on questions pertaining to amendments to the federal Constitution. While “ ‘usage and custom, no matter how long continued, cannot create a right in the legislature that otherwise it does not possess’ ” (Special Assembly Int. Com. v. Southard, supra, 13 Cal.2d at pp. 508-509), we see no evidence the drafters of the California Constitution intended to deprive the Legislature of a tool other state legislatures have long used to ensure they are truly speaking on behalf of their states in the federal constitutional amendment process.
*512 Nevertheless, Howard Jarvis offers a series of arguments for why the structure and implications of various provisions of our state Constitution necessarily bar the Legislature from using an advisory question as a means of investigating the will of the people with respect to federal constitutional amendments. We consider four separate contentions: (1) the Constitution confines the means of investigation to investigation by committee; (2) the Constitution confines the Legislature’s access to the ballot to specifically enumerated circumstances that do not include advisory questions; (3) the Constitution prohibits anyone from placing on the ballot a measure that does not enact law; and (4) the Constitution allocates legislative power to the people and the Legislature in a way that preserves clear lines of accountability and implicitly prohibits devices such as advisory questions that would blur those lines. None has merit; no constitutional provision or set of provisions prohibits the use of advisory ballot measures concerning federal constitutional amendments.
1. The Committees Clause
Howard Jarvis argues that the power to investigate is limited by California Constitution, article IV, section 11, which authorizes investigations by committee. Under that provision, ‘“[t]he Legislature or either house may by resolution provide for the selection of committees necessary for the conduct of its business, including committees to ascertain facts and make recommendations to the Legislature on a subject within the scope of legislative control.” (Ibid.) From this language, Howard Jarvis reasons that the Legislature may ascertain facts only through committee investigations, and not by any other means. This argument misapprehends the import of the committees clause.
Prior to the clause’s adoption in 1940 (see Cal. Const., art. IV, former § 37, added by initiative, Gen. Elec. (Nov. 5, 1940)), the extent of the Legislature’s ability to act through less than all of the members of one house was the subject of dispute. (See Swing v. Riley (1939) 13 Cal.2d 513 [90 P.2d 313]; Special Assembly Int. Com. v. Southard, supra, 13 Cal.2d 497; In re Battelle, supra, 207 Cal. 227.) In Battelle, this court considered but rejected the argument that the Legislature could not investigate by committee, explaining that the Constitution implied a power to investigate and committee investigations were a permissible exertion of that power. (Battelle, at pp. 240-244.) In Special Assembly, we again construed the state Constitution as implying a power to investigate, including a power to investigate by committee. (Special Assembly, at pp. 502-504.) We held, however, that the Legislature was not a continuing body, that it ceased to exist between sessions, that its express powers ceased to exist at the same time, and accordingly that the implied power to investigate died too. (Id. at pp. 504-507.) Consequently, an interim committee established by the Assembly to conduct investigations after legislative adjournment and report to the next session of the Legislature was *513 unconstitutional. (Id. at p. 509; see Swing v. Riley, at pp. 517-520 [extending the same conclusion to a committee created by a joint resolution of both houses].)
At the next general election after Special Assembly, the Legislature placed on the ballot a constitutional amendment making explicit the power to investigate and act by committee and overturning the holdings that that power did not extend between legislative sessions.[14] A ballot argument in support of amendment quoted directly from In re Battelle, supra, 207 Cal. at page 241: In “ ‘the preparation of wise and timely laws the necessity of investigation of some sort must exist as an indispensable incident and auxiliary to the proper exercise of legislative power.’ ” (Voter Information Guide, supra, argument by Assemblymember Voigt in favor of Assem. Const. Amend. No. 2, p. 24.) Another argument explained that, although the inherent power to investigate by committee had always been recognized, “[a] recent court decision has held, however, that this practice in our State is without constitutional authority.” (Id., argument by Assemblymember Cronin in favor of Assem. Const. Amend. No. 2, p. 24 [implicitly referencing Special Assembly].) The amendment’s purpose was to supply, explicitly, the constitutional authority Special Assembly had found lacking. (Voter Information Guide, supra, at p. 24.)
Accordingly, we read the text of the committees clause as language of expansion, not restriction. The ballot argument in support endorses extant precedent establishing an implied power of investigation. The amendment simply removes doubt over whether the Legislature may investigate and carry out other necessary functions also by way of committee; it does not require the Legislature henceforth to inform itself of facts bearing on the need for action only by way of committee. Nothing in California Constitution, article IV, section 11 constrains the Legislature from placing advisory questions on the ballot.
2. Legislative Access to the Ballot
Various provisions of the state Constitution expressly authorize the Legislature to place measures on the ballot for voter approval. The Legislature may amend or repeal a statute adopted by voter initiative, but generally only if the *514 amendment or repeal is first submitted to and approved by the electorate. (Cal. Const., art. II, § 10, subd. (c).) The Legislature may authorize the issuance of bonds, but above a certain amount they must be submitted to the voters for approval. (Id., art. XVI, § 1.) Finally, the Legislature may propose state constitutional amendments, but such amendments must be submitted to the voters for approval. (Id., art. XVIII, §§ 1, 4.)
Invoking the interpretive canon expressio unius est exclusio alterius, Howard Jarvis argues these three specific instances in which legislative achon must be ratified by the voters demonstrate no others are permitted. (See also dis. opn., post, at p. 583 [arguing that the conshtuhonal scheme precludes legislative access to the ballot in other circumstances].) Under the canon, the explicit mention of some things in a text may imply other matters not similarly addressed are excluded. (In re J. W. (2002) 29 Cal.4th 200, 209 [126 Cal.Rptr.2d 897, 57 P.3d 363]; Lake v. Reed (1997) 16 Cal.4th 448, 466 [65 Cal.Rptr.2d 860, 940 P.2d 311].) Applied to specific grants of power, the canon may support “ ‘ “an implied negahve; an implication that no other than the expressly granted power passes by the grant; that it is to be exercised only in the prescribed mode.” ’ ” (Wildlife Alive v. Chickering (1976) 18 Cal.3d 190, 196 [132 Cal.Rptr. 377, 553 P.2d 537]; see Wheeler v. Herbert (1907) 152 Cal. 224, 237 [92 P. 353] [applying the canon to interpret the scope of the Legislature’s powers under the state Const.].)
Here, however, the canon has no applicahon. The expressio unius inference arises only when there is some reason to conclude an omission is the product of intentional design. (Marx v. General Revenue Corp. (2013) 568 U.S. _, _ [185 L.Ed.2d 242, 253, 133 S.Ct. 1166, 1175]; Silverbrand v. County of Los Angeles (2009) 46 Cal.4th 106, 126 [92 Cal.Rptr.3d 595, 205 P.3d 1047].) The text must contain a specific list or facially comprehensive treatment. (See Barnhart v. Peabody Coal Co. (2003) 537 U.S. 149, 168 [154 L.Ed.2d 653, 123 S.Ct. 748] [the canon “has force only when the items expressed are members of an ‘associated group or series,’ justifying the inference that items not mentioned were excluded by deliberate choice, not inadvertence”]; Chevron U. S. A. Inc. v. Echazabal (2002) 536 U.S. 73, 81 [153 L.Ed.2d 82, 122 S.Ct. 2045] [the canon requires a “series of terms from which an omission bespeaks a negative implication”]; In re Sabrina H. (2007) 149 Cal.App.4th 1403, 1411 [57 Cal.Rptr.3d 863] [the canon “is generally applied to a specific statute, which contains a listing of items to which the statute applies” and may not have any application to “an entire code”].) The provisions Howard Jarvis relies on are widely separated, both in where they are codified and as to how and when they were adopted. The provision allowing the Legislature to propose to the electorate amendments to initiative measures was adopted by the voters at the 1946 general election. (See Cal. Const., art. IV, former § 1b, enacted by Prop. 12, Gen. Elec. (Nov. 5, 1946); People v. Kelly (2010) 47 Cal.4th 1008, 1038 [103 Cal.Rptr.3d 733, 222 P.3d *515 186].) The provision providing for bond measures to be placed on the ballot was adopted at the 1878-1879 Constitutional Convention. (Cal. Const., art. XVI, § 1.) The provision providing for the Legislature to place constitutional amendments on the ballot traces all the way back to California’s first Constitution. (Cal. Const. of 1849, art. X, § 1.) Nothing suggests these provisions were intended as a conscious and comprehensive treatment, such that one might infer powers not explicitly conveyed were intentionally omitted.
More fundamentally, Howard Jarvis’s argument rests on a misconception as to the nature of the constitutional provisions it cites. Each involves not a grant of authority but a limitation on legislative power—an occasion when the Legislature must turn to the voters, where otherwise it would have been at liberty to act without voter input. Whatever might be said for the logic of inferring from a few specific grants of authority the absence of some more general authority, that logic cannot be turned on its head to infer from a few specific limits on legislative authority the presence of a broader, unstated limit on legislative authority. The expressio unius canon, were we to apply it here, would at most support the inference that the three cited instances are an exhaustive list of the circumstances in which submission of a matter to a plebiscite is mandatory. The canon and the scattered provisions Howard Jarvis cites offer no guidance at all on the actual question before us, whether the Legislature in its discretion may turn to the voters to ascertain their will concerning a possible amendment to the federal Constitution.
3. The Use of the Ballot for Nonlawmaking Purposes
In a closely related argument, Howard Jarvis notes this court’s holding that the people by initiative may place on the ballot only measures that enact law. (American Federation of Labor v. Eu, supra, 36 Cal.3d at pp. 694, 708-714; see Cal. Const., art. II, § 8, subd. (a) [“The initiative is the power of the electors to propose statutes and amendments to the Constitution and to adopt or reject them.”].) From this, Howard Jarvis reasons that the people’s initiative and referendum power and the constitutional provisions mandating electoral review of particular actions by the Legislature (Cal. Const., art. II, §§ 8-10; id., art. XVI, § 1; id., art. XVIII, §§ 1, 4) define an exhaustive list of matters that may be placed on the ballot, that they all involve the adoption of law, and accordingly that the Constitution forbids ballot measures that do not enact laws.
This contention is a variation on the expressio unius argument just considered and rejected. It depends on the assumption that these scattered provisions of the Constitution—i.e., adding the people’s right to place initiatives and referenda on the ballot to the Legislature’s duty to place *516 certain matters on the ballot—define the exclusive list of matters the electorate may vote on. But there is no reason to infer provisions governing what the people may put on the ballot, and what the Legislature must put on the ballot, limit the wholly separate category, what the Legislature may put on the ballot. Expressio unius est exclusio alterius has no interpretive force here.
Howard Jarvis and the dissent contend that if, under American Federation of Labor v. Eu, supra, 36 Cal.3d 697, the people are limited to placing on the ballot only proposed laws, then the Legislature must be too. We reject that argument as well. Our decision in Eu defined limits on the initiative power, not limits on what the Legislature might do or limits on the proper use of the ballot. Indeed, we explicitly recognized that the Legislature’s powers were broader than those conveyed by the initiative power: “Even under the most liberal interpretation, however, the reserved powers of initiative and referendum do not encompass all possible actions of a legislative body.” (Id. at p. 708.) When the people established the Legislature, they conveyed to it the full breadth of their sovereign legislative powers. (Nougues v. Douglass, supra, 1 Cal. at p. 69.) When they adopted the initiative power in 1911, they restored to themselves only a shared piece of that power. (See Eu, at p. 708.) There is nothing incongruous in reading the state Constitution as allocating broader powers to the deliberative body representing the people than to the people directly. Such is the nature of a republic. (See generally U.S. Const., art. IV, § 4 [guaranteeing a republican form of government]; Browne, Rep. of the Debates in Convention of Cal. on Formation of the State Const. (1850) pp. 393-394 [noting the fundamentally republican nature of the state Constitution]; 1 Willis & Stockton, Debates & Proceedings, Cal. Const. Convention 1878-1879, p. 242 [the state Constitution implicitly establishes a republican form of government].)
Of course Eu of itself does not establish that the Legislature has the specific authority to ask an advisory question about a federal constitutional amendment where the people might lack the power to opine unilaterally on the same matter; that issue, central to this case, was far afield from the question in Eu. The point, rather, is that nothing in Eu forbids this understanding, while the substantially broader powers assured the Legislature by the federal Constitution’s article V and the state Constitution’s article IV, section 1, in contrast to the narrower powers restored to the people by the latter section and the state Constitution’s article II, section 8, support it.
Nor, contrary to the concern of our concurring colleague Justice Liu, does recognizing that the Legislature may pose an advisory question about constitutional matters impermissibly restore to the people a power constitutionally forbidden them. The state Constitution does not prohibit the people from speaking on such questions at the ballot box; it simply fails, in article II, *517 section 8, as construed in Eu, to authorize their doing so unilaterally. That they may not speak when, pursuant to sources of constitutional power outside article II, section 8, they are asked, does not follow.
4. Accountability
Finally, Howard Jarvis argues the state Constitution contains an implicit structural barrier to the use of advisory questions by the Legislature. It asserts new laws may come into being by legislative enactment, with no participation by the people, or they may come into being by initiative, with no involvement from the Legislature (Cal. Const., art. II, § 8; id., art. IV, § 1), and in each instance, accountability for a given law is clear. Advisory questions on legislative matters, in contrast, would supposedly blur lines of accountability and hamper the ability of voters appropriately to evaluate their representatives at the ballot box: should they be held responsible for a particular legislative action pre-approved by the electorate, or not?
As an initial matter, we note our system of government is one in which the lines of accountability are inevitably blurred to some extent. In a representative democracy, legislators are generally expected to be responsive to their constituents. If a representative votes in favor of a legislative measure that tracks the results of an advisory ballot measure, a voter may not be able to know if the representative is voting his or her own conscience or instead is following the views of a majority of the representative’s constituents. But even in the absence of an advisory measure, questions will sometimes arise as to whether a representative’s vote on a particular matter is based on the representative’s individual views or instead reflects those of his or her constituents, as embodied in polls or other gauges of public sentiment.
Moreover, our state Constitution guarantees to the people “the right to instruct their representatives.” (Cal. Const., art. I, § 3, subd. (a).) Although this court has not had occasion to delineate the bounds of that right, its very existence is telling.
Instructions are a practice borrowed from England. They were employed frequently in the colonies as a formal means for the represented to communicate their views to representatives. (See generally Kruman, Between Authority & Liberty, supra, at pp. 76-81; Wood, The Creation of the American Republic 1776-1787 (1998) pp. 189-190; Terranova, The Constitutional Life of Legislative Instructions in America (2009) 84 N.Y.U. L.Rev. 1331, 1333-1339.) For example, states delivered instructions to their delegates in connection with the issuance of the Declaration of Independence, during the period of the Articles of Confederation, and to guide deliberations at the 1787 Constitutional Convention. (Kobach, May “We the People” Speak?: The *518 Forgotten Role of Constituent Instructions in Amending the Constitution (1999) 33 U.C. Davis L.Rev. 1, 38-58.) Views varied as to their compulsory nature; while English legislators had increasingly taken the position that instructions were precatory, some Americans in the colonial period treated them as more binding. (Kruman, at pp. 76-77; Terranova, at pp. 1333-1339; Kobach, at pp. 30-37.) A right to instruct congressional representatives was proposed as an addition to the draft First Amendment, but ultimately foundered on uncertainty over the effect to be given instructions, among other concerns. (1 Annals of Cong., supra, at pp. 760-776.)
Unlike the federal Constitution, the state Constitution has codified a right to instruct since before statehood. (See Cal. Const, of 1849, art. I, § 10 [“The people shall have the right freely to assemble together, to consult for the common good, to instruct their representatives, and to petition the Legislature for redress of grievances.”].) Its incorporation into the state Constitution was accompanied by many of the same fundamental debates seen at the federal level in connection with the omission of the right from the First Amendment—Are representatives independent or agents? Do they represent the constituents of their district or the entire state/country? If a right to instruct were granted, would instructions be binding?—hut the state convention ultimately struck a balance in favor of, rather than against, a right to instruct. (See Browne, Rep. of the Debates in Convention of Cal. on Formation of the State Const., supra, at pp. 42, 294-297.)
That right clouds to some extent the attribution of responsibility for representative actions. If instructions are given and disobeyed, no accountability problem arises; plainly the representative has voted his or her conscience, and the electorate may provide, if it chooses, the same response that met Edmund Burke.[15] But if the representative acts in a manner consistent with instructions, then observers may reasonably ask whether the representative was acting according to his or her personal choice or simply following instructions. The constitutional right of the people to instruct their representatives thus blurs, to some degree, the lines of accountability for representative actions.
In any event, whatever the general merits of the concern that advisory ballot measures blur accountability, the concern is less significant in the context of a measure such as Proposition 49 relating to federal constitutional *519 amendment. Responsibility for the ultimate action sought, a proposed federal amendment, lies not with the Legislature or the people of California, but with the members of Congress, the entity constitutionally charged with proposing amendments. To the extent individual state legislators must be accountable for their role in steps leading to an amendment, they may be judged for their votes on the earlier resolution seeking a convention and on the bill placing the advisory question on the ballot.
C. Conclusion
The federal Constitution is our nation’s fundamental charter and the source of its supreme law. Only supermajorities of the people’s representatives and the several states can alter the course it sets for our country. (See art. V.) Over the last century and more, state legislatures have seen fit to resort to the ballot box for guidance on whether to propose or ratify potential federal constitutional amendments. This past use of advisory questions to inform the federal constitutional process evidences a larger truth—a recognition of the particular appropriateness of consulting the polity in the course of exercising independent judgment with respect to such foundational matters.
That truth draws its strength from “the animating principle of our Constitution that the people themselves are the originating source of all the powers of government.” (Arizona State Legislature v. Arizona Independent Redistricting Comm’n (2015) 576 U.S. _, _ [192 L.Ed.2d 704, 729-730, 135 S.Ct. 2652, 2671].) If that be so, there can be little complaint with a legislature, before pursuing constitutional change, seeking to obtain from the people of the state “the deliberate sense of the community.” (The Federalist No. 71, supra, at p. 482 (Hamilton).) Moreover, the solemnity of the matter to be considered justifies obtaining popular input through an equally solemn formal vote, rather than a mere opinion poll or other unofficial solicitation of views. While Hamilton (and many others) objected to binding instructions from the people, no similar constitutional objections attach to purely advisory votes. Legislators may solicit and consider the views of the people on fundamental matters pertaining to federal constitutional amendments, while at the same time remaining free ultimately to act differently after due deliberation with fellow members of their representative body. The Legislature possesses broad discretion, when conducting an investigation under its implied state constitutional authority, “to select the means within reasonable bounds.” (Parker v. Riley, supra, 18 Cal.2d at p. 91.) We conclude the enactment of a statute placing an advisory question on the ballot in order to investigate popular sentiment on a matter of federal constitutional dimension falls within that discretion.
Our concurring colleague, Justice Liu, expresses concern that we, like the Legislature, have rested authority for the advisory question here on the *520 investigative power rather than on the plenary lawmaking power alone. (Conc. opn. of Liu., J., post, at p. 575.) He argues that the lawmaking power and power to enact statutes are coextensive, and resort to any other power to justify a statute would raise doubts about the plenary nature of the lawmaking power. This line of argument confuses the form of legislative action—statute, resolution, something else—with the nature of the underlying power justifying the exercise of that action—lawmaking power, investigative power, ratifying power, something else. Though the lawmaking power may be exercised only by statute (Cal. Const., art. IV, § 8, subd. (b)), we have never held the converse, that every statute may be justified only as an exercise of the lawmaking power. When California joined the wave of states enacting statutes governing the ratifying conventions for the Twenty-first Amendment (ante, p. 501), its actions were not authorized by its general lawmaking powers alone, but pursuant to an implied article V power to regulate the procedures for that one-time-only event. Justice Liu likewise would justify enactment of the statute here based not on the naked power to make laws, but on an implied article V power, albeit while adopting an unduly restrictive understanding of state legislative powers. Neither that explanation nor ours places in any doubt the plenary nature of the Legislature’s lawmaking power.
Justice Liu also expresses concern that the means of investigation selected here is unlike the methods expressly addressed in previous cases. But novelty alone is no basis for imposing a categorical constitutional barrier where none otherwise exists. Here, as we have discussed, none does.
IV. The Nexus Between Proposition 49 and the Exercise of Powers Related to Federal Constitutional Amendment
Having concluded the Legislature may use advisory ballot questions to facilitate the exercise of its article V functions, we next consider whether the specific measure before us, Proposition 49, is a reasonable exercise, not barred by any law, of the Legislature’s power to investigate and determine the best course of action in connection with a potential federal constitutional amendment. Howard Jarvis contends that because the Legislature has already submitted to Congress a call for a national convention, no further purpose can be served by a ballot measure. We disagree.
In evaluating the connection between Proposition 49 and the Legislature’s powers, we are mindful of our limited role. “ ‘It is no small matter for one branch of the government to annul the formal exercise by another and coordinate branch of power committed to the latter, and the courts should not and must not annul, as contrary to the constitution, a statute passed by the Legislature, unless it can be said of the statute that it positively and certainly is opposed to the constitution.’ ” (Methodist Hosp. of Sacramento v. Saylor *521 (1971) 5 Cal.3d 685, 692 [97 Cal.Rptr. 1, 488 P.2d 161].) “[A]ll intendments favor the exercise of the Legislature’s plenary authority: ‘If there is any doubt as to the Legislature’s power to act in any given case, the doubt should be resolved in favor of the Legislature’s action.’ ” (Id. at p. 691.) Nor, in holding up the Legislature’s actions to the light of the Constitution, will we inquire into underlying motives; our review is confined to determining whether an action itself is at odds with constitutional imperatives. (City and County of San Francisco v. Cooper (1975) 13 Cal.3d 898, 913 [120 Cal.Rptr. 707, 534 P.2d 403]; County of Los Angeles v. Superior Court (1975) 13 Cal.3d 721, 727 [119 Cal.Rptr. 631, 532 P.2d 495].) If any reasonable connection between the proposed ballot measure and the Legislature’s article V-related powers is discernable, it will suffice.[16]
We conclude there is a sufficient nexus between Proposition 49 and, at a minimum, the potential exercise of every one of the Legislature’s amendment powers. For the legislators of a state collectively to call on Congress for a federal amendment, or to call for a national convention, is one matter. For the people of a state, by the millions, to vote in favor of pursuing an amendment is another. The 1892 plebiscite concerning direct election of senators yielded a resounding 93 percent to 7 percent majority in favor of constitutional change. (Rossum, California and the Seventeenth Amendment in The California Republic, supra, at p. 84.) The Legislature rationally could believe that a decisive result in the present day might carry more weight with members of Congress, when deciding whether to propose or vote in favor of an amendment,[17] and with other state legislatures, in their deliberations over whether to *522 join California’s call for a constitutional convention,[18] than the Legislature’s call alone. Election results might also inform the Legislature’s decision whether to formally supplement its convention call with a joint resolution asking Congress to propose an amendment, just as both methods of soliciting amendment were employed in the late 19th and early 20th centuries in connection with senatorial selection and in 1935 in connection with tax reform. (Ante, pp. 502-504.) Finally, if either Congress or a national convention were to propose an amendment, a plebiscite would inform the Legislature’s decision on ratification. (See Idaho Sen.J.Res. No. 101 (50th Leg., 1st Reg. Sess. 1989), reprinted in 101 Cong. Rec. S7911 (daily ed. July 13, 1989) [ratifying the 27th Amend, following solicitation of a popular vote].)
Moreover, even a result at the ballot box rejecting the proposal could afford material assistance to the Legislature in determining how to exercise its article V-related powers. Although the Legislature has already called for a constitutional convention, ‘“[w]hat the Legislature has enacted, it may repeal.” (California Redevelopment Assn. v. Matosantos, supra, 53 Cal.4th at p. 255; see Fletcher v. Peck (1810) 10 U.S. 87, 135 [3 L.Ed. 162] (6 Cranch) [“one legislature is competent to repeal any act which a former legislature was competent to pass”].) Nothing in the text of article V establishes an intent to depart from this fundamental understanding about the nature of legislative bodies and to afford Congress and state legislatures only the power to make, but never to withdraw, proposals. Indeed, the logic of the amendment process the Article establishes urges strongly to the contrary. Convention calls take effect only when a supermajority, two-thirds of the legislatures, have joined in. A national consensus is a foundational necessity. To allow the making of calls, but not their subsequent negation, might place Congress under orders to call a convention when far fewer states, perhaps not even a majority, presently favored amendment. It follows that convention calls are not static; they can be, and as a matter of historical practice frequently have been, rescinded. (See, e.g., Nev. Assem. Res. No. 157 (1989 Reg. Sess.), reprinted in 101 Cong. Rec. S7911 (daily ed. July 13, 1989) [rescinding convention call]; Kyvig, Explicit & Authentic Acts, supra, at p. 378 [noting N.C. and Okla. rescissions of convention calls]; Paulsen, A General Theory of Article V: The Constitutional Lessons of the Twenty-seventh Amendment (1993) 103 Yale L.J. 677, 765-789 [cataloguing both state-by-state convention calls and their repeals].) The Legislature has called for a national convention; it might, *523 upon sober and mature reflection informed by popular disapproval at the ballot box, reconsider and rescind as unwise that resolution.
Illustrative of the relevance an advisory vote can have even after a legislature has acted is the case of the Massachusetts legislature’s 1924-1925 change of heart on the question of a child labor amendment. In 1924, Massachusetts was among those states petitioning Congress for submission of a constitutional amendment to the states to overturn United States Supreme Court decisions limiting Congress’s regulatory power over child labor. However, when Congress complied and proposed an amendment, the state’s legislature did not immediately act but instead submitted the question of ratification to a November 1924 advisory vote of the people. The plebiscite demonstrated widespread popular opposition, with the amendment losing by more than three to one. Taking those views into account, the legislature reversed its support from the year before and declined to ratify the amendment. (Kyvig, Explicit & Authentic Acts, supra, at pp. 259-260.) So too, an advisory vote may guide a legislature in deciding whether to persist with efforts to obtain, or rescind a call for, a national convention or congressio-nally proposed federal amendment.
Accordingly, we conclude Proposition 49 is a reasonable and lawful means of assisting the Legislature in the discharge of its article V-related functions. Howard Jarvis has identified no constitutional obstacle. Proposition 49’s placement on a statewide ballot may be upheld as an exercise of the Legislature’s implied power under the California Constitution to investigate and determine the best course of action in connection with a potential federal constitutional amendment.
Disposition
We discharge the order to show cause, deny Howard Jarvis’s petition for a peremptory writ of mandate, and vacate our previously ordered stay.
Cantil-Sakauye, C. J., Corrigan, J., Cuéllar, J., and Kruger, J., concurred.

 President Barack H. Obama, State of the Union Address to Congress, 156 Congressional Record H415 (daily ed. Jan. 27, 2010).

 Senate Joint Resolution No. 19, 113th Congress, 1st Session (2013); see Senate Report No. 113-223, 1st Session, pages 2-3 (2013).

 See American Tradition Partnership v. Bullock (2012) 567 U.S. 516, _ [132 S.Ct. 2490, 2491-2492, 183 L.Ed.2d 448, 448-449] (dis. opn. of Breyer, J.) (dissent joined by Ginsburg, Sotomayor & Kagan, JJ.).

 See Senate Bill No. 1272, as amended March 28, 2014, section 1 (calling a special election in conjunction with the Nov. 2016 general election).

 Justice Liu issued a separate concurring statement defending the decision to provisionally forestall a vote on Proposition 49, while Chief Justice Cantil-Sakauye dissented from the portion of the order granting a stay, maintaining that interim relief was unwarranted.

 Because we conclude the investigative power permits advisory questions in connection with potential federal constitutional amendments, we express no opinion about other potential sources of authority for advisory questions.

 See also The Federalist No. 44 (Cooke ed., 1961) pages 304-305 (Madison) (“No axiom is more clearly established in law, or in reason, than that wherever the end is required, the means are authorised; wherever a general power to do a thing is given, every particular power necessary for doing it is included.”); The Federalist No. 33, supra, at page 204 (Hamilton) (“What is a power, but the ability or faculty of doing a thing? What is the ability to do a thing, but the power of employing the means necessary to its execution?”).

 At one point, the Drafters of the federal Constitution contemplated a more direct role for the states in initiating change. The penultimate version of article V would have granted the state legislatures themselves the power to propose amendments, but in the final days of the 1787 convention that power was excised in favor of the power to call for a convention. (See 2 Records of the Federal Convention of 1787 (Farrand edit., 1966 ed.) pp. 559, 629-630.) The elimination of a direct power to propose amendments has given rise to the current practice, whereby state legislatures resolve to Congress that it should act, and Congress in turn decides whether to invoke its article V proposal power. Such legislative resolutions are firmly ensconced in our constitutional traditions and, we have observed, are fully consistent with article V. (American Federation of Labor v. Eu, supra, 36 Cal.3d at p. 707.)

 See Assembly Concurrent Resolution No. 9 (1873-1874 Reg. Sess.) resolution chapter 20, page 973; Assembly Joint Resolution No. 7 (1893 Reg. Sess.) resolution chapter 15, page 620; Senate Joint Resolution No. 2 (1900 Ex. Sess.) resolution chapter 7, pages 27-28. In 1911, the Legislature changed tack and invoked its express article V powers, applying for a constitutional convention to propose an amendment providing for the direct election of senators. (Sen. Joint Res. No. 25, Stats. 1911 (1911 Reg. Sess.) res. ch. 73, pp. 2183-2184; see Remarks of Sen. Jones, 46 Cong. Rec. 2770 (1911) [“possibly Idaho and California got tired of knocking at the door of the Senate and concluded that they would take their own method”].)

 See Lucas v. Colorado Gen. Assembly (1964) 377 U.S. 713 [12 L.Ed.2d 632, 84 S.Ct. 1459]; Roman v. Sincock (1964) 377 U.S. 695 [12 L.Ed.2d 620, 84 S.Ct. 1449]; Davis v. Mann (1964) 377 U.S. 678 [12 L.Ed.2d 609, 84 S.Ct. 1441]; Maryland Committee v. Tawes (1964) 377 U.S. 656 [12 L.Ed.2d 595, 84 S.Ct. 1429]; WMCA, Inc. v. Lomenzo (1964) 377 U.S. 633 [12 L.Ed.2d 568, 84 S.Ct. 1418]; Reynolds v. Sims (1964) 377 U.S. 533 [12 L.Ed.2d 506, 84 S.Ct. 1362]; Baker v. Carr (1962) 369 U.S. 186 [7 L.Ed.2d 663, 82 S.Ct. 691].

 Because Proposition 49 relates solely to the exercise of power in connection with article V, we reserve for another day whether, in support of other powers not implicated here, an advisory ballot measure would be a permissible means of legislative investigation.

 Cato’s Letters, a series of republican critiques of tyranny and defenses of liberty and free speech, were broadly circulated and heavily influential among this nation’s founding *506 generation. (Bailyn, The Origins of American Politics (1968) pp. 53-55; Rossiter, Seedtime of the Republic: The Origin of the American Tradition of Political Liberty (1953) pp. 141-142, 357.)

 The United States Supreme Court in Hawke v. Smith. No. 1. supra, 253 U.S. at pages 228-230 invalidated an attempt to subject a legislature’s decision respecting ratification to a state law referendum because doing so would contradict article V’s allocation of authority to the legislatures themselves. In Leser v. Garnett, supra, 258 U.S. at page 137, the Supreme Court reaffirmed that a state legislature’s actions in ratifying amendments are purely federal in character and “transcendf] any limitations sought to be imposed by the people of a State.”

 As enacted, California Constitution, article IV, former section 37 specified that “[t]he resolution creating any such committee may authorize it to act either during sessions of the Legislature or after final adjournment.” (Voter Information Guide, Gen. Elec. (Nov. 5, 1940) text of Assem. Const. Amend. No. 2, p. 17, appen.) When the state Constitution was revised and modernized in 1966, the committees clause was moved to its present location, article IV, section 11. Six years later, the Legislature’s calendar was amended to eliminate lengthy periods of adjournment between sessions, and the language relating to intersession committees was deleted as superfluous. (See Prop. 4, as approved by voters, Gen. Elec. (Nov. 7, 1972).)

 In 1774, Burke offered a classic commentary on the nature of representation in a speech to the electors of Bristol, England. He denounced binding instructions, explaining that while constituent opinions were of great interest, ultimately it was the representative’s duty to act not as mere agent but as a member of a deliberative body acting in the best interests of the whole. (Bresler, Rediscovering the Right to Instruct Legislators (1991) 26 New Eng. L.Rev. 355, 362.) Bristol rewarded Burke’s independence by declining to reelect him. (Bogus, Rescuing Burke (2007) 72 Mo. L.Rev. 387, 405-408; Bresler, at p. 362.)

 The dissent concedes both the Legislature’s power to investigate and to carry out article V functions. (Dis. opn., post, at pp. 585-587.) But the dissent contends that, if allowed to submit an advisory question, the Legislature might use that power to interfere with the people’s power of initiative by submitting rival “competing measures.” (Id. at p. 585.) For fear of such abuse, the dissent evidently would impose on the Legislature the burden of showing the use of any advisory question is indispensable to the exercise of these recognized powers. (Id. at p. 588.)
We have held that the people’s initiative power does not extend to advisory measures proposing constitutional change. (American Federation of Labor v. Eu, supra, 36 Cal.3d at p. 694.) A legislative ballot measure inquiring about a federal constitutional matter, such as we address here, would never compete or interfere with any rival proposition that the people had the authority, under their initiative power as construed in Eu. to place on the ballot. There is no warrant to depart from the settled understanding that the Legislature has discretion to choose within reasonable bounds its means of investigation, without first having to demonstrate no alternative means exist. (See Parker v. Riley, supra, 18 Cal.2d at p. 91.)

 Arguably, the mounting wave of convention calls and proamendment state resolutions played a role in the United States Senate finally capitulating and joining the House of Representatives in proposing a direct election amendment. (See Kobach, Rethinking Article V. Term Limits and the Seventeenth and Nineteenth Amendments (1994) 103 Yale L.J. 1971, 1976-1980.) The Legislature could reasonably conclude the members of Congress are not immune to showings of political and popular support for change.

 The California Legislature’s pending convention call is without force until 33 other legislatures join in. (See art. V.) Just as Pennsylvania’s Legislature once coordinated a campaign to marshal the requisite number of convention calls in support of direct election of senators (Hall, The History and Effect of the Seventeenth Amendment, supra, at pp. 223-225; Haynes, The Election of Senators, supra, at pp. 122-125, 275-276; Kyvig, Explicit & Authentic Acts, supra, at p. 210), so our Legislature may take steps directed at persuading other legislatures in order to make its own call meaningful.