Filed 8/23/18

CERTIFIED FOR PUBLICATION

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| CENTER FOR COMMUNITY ACTION AND ENVIRONMENTAL JUSTICE,<br><br>    Petitioner and Appellant,<br><br>    v.<br><br>CITY OF MORENO VALLEY et al.,<br><br>    Defendants and Respondents.<br><br>HF PROPERTIES, et al.,<br><br>    Real Parties in Interest and Respondents. | D073451<br><br><br>(Riverside Super. Ct. Nos. RIC1601988MF & RIC1602094) |
| SOCAL ENVIRONMENTAL JUSTICE ALLIANCE,<br><br>    Petitioner and Appellant,<br><br>    v.<br><br>CITY OF MORENO VALLEY et al.,<br><br>    Defendants and Respondents.<br><br>HF PROPERTIES, et al.,<br><br>    Real Parties in Interest and Respondents. | (Riverside Super Ct. Nos. RIC1601988MF & RIC1602243) |

Appeals from a judgment of the Superior Court of Riverside County, Sharon J. Waters, Judge. Reversed and remanded with directions.

Earthjustice, Adriano L. Martinez and Oscar Espino-Padron for Petitioners and Appellants Center for Community Action and Environmental Justice, Center for Biological Diversity, Coalition for Clean Air, and San Bernardino Valley Audubon Society.

Shute, Mihaley & Weinberger, Rachel B. Hooper, Sara A. Clark, Allison A. Johnson; Earthjustice, Adriano L. Martinez, Oscar Espino-Padron; and Daniel P. Selmi for Petitioner and Appellant Sierra Club.

Blum Collins, Steven A. Blum, Craig M. Collins, and Gary Ho for Petitioner and Appellant SoCal Environmental Justice Alliance.

Martin D. Koczanowicz, City Attorney for Defendants and Respondents the City of Moreno Valley and the City Council of the City of Moreno Valley.

Cox, Castle & Nicholson and Kenneth B. Bley for Real Parties in Interest HF Properties, Sunnymead Properties, Theodore Properties Partners, 13451 Theodore, LLC, and HL Property Partners.

I

INTRODUCTION

In 2015, the City of Moreno Valley (the City) adopted an initiative to approve a development agreement in connection with the World Logistics Center (WLC) project.

The WLC developers are known collectively as Highland Fairview (with the City, Respondents).[1] The Center for Community Action and Environmental Justice and other environmental groups (Appellants)[2] petitioned for a writ of mandate, contending that adoption of a development agreement by initiative violated the development agreement statute (Gov. Code § 65864, et seq.)[3] and article II, section 12 of the California Constitution, which bars an initiative that "names or identifies any private corporation to perform any function or to have any power or duty." The trial court denied Appellants' petitions, and they appealed.

We conclude that the Legislature intended to exclusively delegate approval of development agreements to local legislative bodies and to make such approval subject to referendum, but not to initiative. The development agreement initiative adopted by the City is therefore invalid. Based on the foregoing conclusions, we need not resolve Appellants' constitutional argument. We reverse the judgment and remand with directions.

---

[1] The individual entities are HF Properties, Sunnymead Properties, Theodore Properties Partners, 13451 Theodore, LLC, and HL Property Partners.

[2] The other appellants are the Center for Biological Diversity, Coalition for Clean Air, Sierra Club, San Bernardino Valley Audubon Society, and the SoCal Environmental Justice Alliance.

[3] Further statutory references are to the Government Code unless otherwise noted.

## II

## FACTUAL AND PROCEDURAL BACKGROUND

Highland Fairview proposed the development of the WLC project. In May 2015, the City released a final environmental impact report, which found that the WLC could have numerous impacts, including decreased air quality and increased traffic. In August 2015, the Moreno Valley City Council (City Council) adopted ordinances and resolutions approving the project, including Ordinance 901, which approved a development agreement between the City and Highland Fairview. Appellants and other entities filed lawsuits challenging the project for failure to comply with the California Environmental Quality Act (CEQA).[4]

In November 2015, the Moreno Valley Jobs Coalition filed an initiative petition (the Moreno Valley Workforce Training Initiative), which would repeal Ordinance 901 and approve the World Logistics Center Development Agreement. Highland Fairview supported and funded the initiative. The development agreement proposed in the initiative petition was substantially similar to the original one that the City Council had approved, but removed the Highland Fairview entities as named parties and replaced references to Highland Fairview with the "Property Owners" (defined as "the property owners as of the Effective Date of this agreement"). The initiative received sufficient

_____

[4]     Appellants request judicial notice of documents reflecting that the trial court in the CEQA lawsuits found the environmental review inadequate and that a peremptory writ was issued. We deny the request because the proceedings in the CEQA lawsuits are not necessary for our analysis here. (*People v. Rowland* (1992) 4 Cal.4th 238, 268, fn. 6 (*Rowland*) [declining to take judicial notice of irrelevant court records].)

4

signatures to qualify for the ballot. Once the initiative qualified for the ballot, the City Council had the option of adopting the initiative (which it called the "World Logistic[s] Center Development Agreement Initiative"), rather than submitting it to the voters, and voted to do so.

In February 2016, Appellants filed petitions for writ of mandate, challenging the City Council's adoption of the initiative. In September 2016, the trial court denied the petitions. Appellants timely appealed.

III

DISCUSSION

Appellants contend that the Legislature exclusively delegated the power to enter into development agreements to the local governing body, thus precluding adoption by initiative. We agree.

A. *Overview of applicable law*

1. *The development agreement statute*

In 1976, the California Supreme Court held that a developer that had commenced work and expended large sums on a project did "not acquire[] a vested right under the common law to proceed with its development absent a [building] permit." (*Avco Community Developers, Inc. v. South Coast Regional Com.* (1976) 17 Cal.3d 785, 797 (*Avco*); *id*. at p. 791.) The Court indicated that any change in this rule "must be provided by the Legislature." (*Id.* at p. 796.) In 1979, the Legislature enacted the development agreement statute to address the uncertainty that resulted from late vesting and its adverse impact on development. (See *Mammoth Lakes Land Acquisition, LLC v. Town of*

5

*Mammoth Lakes* (2010) 191 Cal.App.4th 435, 443 (*Mammoth Lakes*); § 65864, subds. (a)-(b) [legislative findings; see further discussion *post*].)  The statute "provided a way for the municipality and developer to depart from the common law rule of vested rights." (*Mammoth Lakes*, at p. 443.)

A development agreement "is an enforceable contract between the municipality and the developer." (*Mammoth Lakes, supra*, 191 Cal.App.4th at p. 442.)  "In essence, the statute allows a city or county to freeze zoning and other land use regulation applicable to specified property to guarantee that a developer will not be affected by changes in the standards for government approval during the period of development."  (*Santa Margarita Area Residents Together v. San Luis Obispo County Bd. of Supervisors* (2000) 84 Cal.App.4th 221, 226-227 (*SMART*); § 65866.)  It also permits "municipalities to extract promises from the developers concerning financing and construction of necessary infrastructure."  (*Mammoth Lakes*, at p. 443-444.)

Section 65867.5 addresses the approval of development agreements, and states in pertinent part:  "(a) A development agreement is a legislative act that shall be approved by ordinance and is subject to referendum. [¶] (b) A development agreement shall not be approved unless the legislative body finds that the provisions of the agreement are consistent with the general plan and any applicable specific plan."

"[N]umerous procedural and substantive limitations attend the making and performance" of a development agreement. (*Trancas Property Owners Assn. v. City of Malibu* (2006) 138 Cal.App.4th 172, 182.)[5]

### 2. *Initiative and referendum in California*

"The Constitution 'speaks of the initiative and referendum, not as a right granted the people, but as a power reserved by them.' [Citation.] . . . [C]ourts have consistently declared it their duty to ' "jealously guard" ' and liberally construe the right so that it ' "be not improperly annulled." ' [Citations.] Moreover, when weighing the tradeoffs associated with the initiative power, we have acknowledged the obligation to resolve doubts in favor of the exercise of the right whenever possible." (*California Cannabis Coalition v. City of Upland* (2017) 3 Cal.5th 924, 934 (*Upland*).)

There is a "basic presumption in favor of the electorate's power of initiative and referendum." (*DeVita v. County of Napa* (1995) 9 Cal.4th 763, 786 (*DeVita*); *id.* at p. 787, fn. 9 ["any legislative act may be enacted by initiative and may be subject to

---

5     A city or county's development agreement procedures must require at least annual review of a developer's "good faith compliance with the terms of the agreement," and if the "local agency finds and determines . . . that the applicant . . . has not complied in good faith . . . , the local agency may terminate or modify the agreement." (§ 65865.1.) The agreement must state certain terms (e.g., duration, permitted uses, etc.), and may address others (e.g., applicant financing of public facilities). (§ 65865.2.) There must be a public hearing "by the planning agency and by the legislative body," and "[n]otice of intention to consider adoption of a development agreement" must be provided. (§ 65867.) An agreement "may be amended, or canceled . . . , by mutual consent of the parties to the agreement"; notice of intention to amend must be given, and the amendment is subject to section 65867.5. (§ 65868.) If subsequent law or regulation prevents compliance, affected provisions "shall be modified or suspended as may be necessary to comply with such state or federal laws or regulations." (§ 65869.5.)

7

referendum"].)  However, "[t]he presumption in favor of the right of initiative is rebuttable upon a definite indication that the Legislature, as part of the exercise of its power to preempt all local legislation in matters of statewide concern, has intended to restrict that right."  (*Id.* at p. 775; *Upland, supra*, 3 Cal.5th at p. 946 ["[T]he best way to implement our oft-repeated references to the importance of the initiative is to avoid presuming that a provision constrains that power without a clear statement or equivalent evidence that such was the provision's intended purpose."].)

In *Committee of Seven Thousand v. Superior Court* (1988) 45 Cal.3d 491 (*COST*), the California Supreme Court recognized that "[i]n some cases," the Legislature intended "to delegate the exercise of [legislative] authority exclusively to the governing body, thereby precluding initiative and referendum."  (*DeVita, supra*, 9 Cal.4th at p. 776 [describing holding in *COST*].)  The Court "set forth certain guidelines for determining when the legislative intent to exclusively delegate authority to the local governing bodies is present."  (*DeVita*, at p. 776.)  It considered the statutory language (focusing there on the identification of the local governmental entity); whether the subject at issue was a matter of "statewide concern" or a "municipal affair"; and other indications of legislative intent, including another statutory provision and the legislative history.  (*COST*, at pp. 501, 507-509; see *DeVita*, at p. 776.)

### 3. *Statutory interpretation principles*

" ' "Where, as here, the facts are undisputed and the issue involves statutory interpretation, we exercise our independent judgment and review the matter de novo." ' " (*San Bruno Committee for Economic Justice v. City of San Bruno* (2017) 15 Cal.App.5th

524, 529.)  "Our primary task in interpreting a statute is to determine the Legislature's intent, giving effect to the law's purpose.  [Citation.]  We consider first the words of a statute, as the most reliable indicator of legislative intent.  [Citation.]  ' " 'Words must be construed in context, and statutes must be harmonized, both internally and with each other, to the extent possible.' [Citation.]  Interpretations that lead to absurd results or render words surplusage are to be avoided. [Citation.]" [Citation.]' "  (*Tuolumne Jobs & Small Business Alliance v. Superior Court* (2014) 59 Cal.4th 1029, 1037.)

"If the statutory language permits more than one reasonable interpretation, courts may consider other aids, such as the statute's purpose, legislative history, and public policy."  (*Coalition of Concerned Communities, Inc. v. City of Los Angeles* (2004) 34 Cal.4th 733, 737.)  "Interpretation of the statute should be consistent with the purpose of the statute and statutory framework."  (*Fireman's Fund Ins. Co. v. Workers' Comp. Appeals Bd.* (2010) 189 Cal.App.4th 101, 110.)  "Even if the statutory language is clear, a court is not prohibited from considering legislative history in determining whether the literal meaning is consistent with the purpose of the statute."  (*Ibid.*)[6]

---

[6]    The parties address portions of the legislative history in their briefing.  On our own motion, we take judicial notice of documents comprising the legislative history of the development agreement statute.  (Evid. Code, §§ 452, 459; see *In re Donovan L.* (2016) 244 Cal.App.4th 1075, 1088.)

9

B.      *The Legislature intended to exclusively delegate approval of development agreements to governing bodies*

   1.      *Statutory language*

      a.      *Meaning of the phrase "subject to referendum"*

Appellants argue that the phrase "subject to referendum" in section 65867.5, subdivision (a), reflects legislative intent to preclude the power of initiative to adopt development agreements.  Respondents contend that we do not know the Legislature's reasons for including only the term referendum, and cannot infer that by referring only to referendum, the Legislature intended to preclude initiative.

Appellants' proposed interpretation is more reasonable.  The Legislature stated that a development agreement is a "legislative act" that is "subject to referendum."  Absent legislative intent to the contrary, it is presumed that a legislative act is subject to both initiative and referendum.  (See *DeVita, supra*, 9 Cal.4th at p. 786; see *id.* at p. 776 [noting "general dichotomy between a governing body's legislative acts, which are subject to initiative and referendum, and its administrative or executive acts, which are not."].)  However, the Legislature specified that a development agreement is "subject to referendum," while omitting "initiative"; there must be some reason it did so.  (See *Kulshrestha v. First Union Commercial Corp.* (2004) 33 Cal.4th 601, 611 ["We assume each term [in a statute] has meaning and appears for a reason."].)  An intent to preclude initiative, and instead, to delegate approval decisions to local governing bodies (subject to referendum), is a plausible basis for the omission.  This interpretation is supported by the principle of *expressio unius est exclusio alterius*, which means that "the expression of

10

certain things in a statute necessarily involves exclusion of other things not expressed . . . ." (*Dyna-Med, Inc. v. Fair Employment & Housing Com.* (1987) 43 Cal.3d 1379, 1391, fn. 13.) The presumption in favor of initiative provides "some reason to conclude" that the inclusion of the reference to referendum and the concomitant omission of any reference to initiative in the development agreement statute is "the product of intentional design," and thus, meaningful. (*Howard Jarvis Taxpayers Assn. v. Padilla* (2016) 62 Cal.4th 486, 514.)

We recognize that the Legislature did not expressly state that adoption of a development agreement by initiative was barred, but that is not required; rather, "equivalent evidence" of intent is sufficient. (*Upland, supra*, 3 Cal.5th at p. 946; see *COST, supra*, 45 Cal.3d at p. 509 [relying on the "language, subject matter, and history" of the transportation statute at issue to conclude that the Legislature intended exclusive delegation and the initiative conflicted with the statute].) The Legislature's designation of a development agreement as a legislative act, coupled with its decision to reference only referendum, provides textual support for a limitation on initiative that we cannot ignore.

*Meldrim v. Board of Supervisors* (1976) 57 Cal.App.3d 341 (*Meldrim*) and *Jahr v. Casebeer* (1999) 70 Cal.App.4th 1250 (*Jahr*) are instructive. Both cases addressed an amendment to the California Constitution, proposed by the Legislature and approved by the voters, that moved county supervisor compensation decisions from the Legislature to the county governing bodies. (*Meldrim*, at pp. 343-344.) The amendment stated, in part, that "each governing body shall prescribe by ordinance the compensation of its members, but the ordinance prescribing such compensation shall be subject to referendum." (Cal.

11

Const., art. XI, § 1, subd. (b).)[7] *Meldrim* held that an initiative setting county supervisor compensation violated this provision. (*Meldrim*, at pp. 343-344 [explaining that the language was "clear" and "the voters . . . specifically gave [the power to set supervisor salaries] to the governing bodies themselves, subject to referendum."].) *Jahr* likewise held that an initiative to revise supervisor compensation was unconstitutional, citing *Meldrim* with approval. (*Jahr*, at pp. 1252, 1254; see *id.* at p. 1254 "[The language could not be clearer that article XI, section 1(b) authorizes voters to challenge county supervisors' salaries by *referendum*."].)[8]

Respondents contend that *Meldrim* and *Jahr* are distinguishable, stating that those decisions (together with *Voters for Responsible Retirement v. Board of Supervisors* (1994) 8 Cal.4th 765, 777 (*VFRR*), discussed *post*) merely confirm that "the right of initiative and referendum . . . can be narrowed or prohibited altogether by the people themselves where the legislative history—there a constitutional, rather than statutory, enactment—makes it clear that only the referendum is to be allowed," and thus implying that the decisions in those cases turned on the fact that article XI, section 1(b), was voter-approved. Respondents also argue that, in *Jahr*, it was the reference to the " 'members' of the 'governing body' that so clearly expressed the people's intent" to exclusively delegate

---

7    Further references to article XI, section 1(b) are to the California Constitution unless otherwise noted.

8    We recognize that *Jahr* then indicated that there was nothing in the provision "to suggest the electorate . . . intended to grant . . . *initiative power* . . . ." (*Jahr, supra*, 70 Cal.App.4th at p. 1254.) The initiative power is reserved (not granted). We nonetheless find guidance in the decision's focus on the clarity of the referendum language.

12

matters of supervisors' compensation to the supervisors themselves, and there is no comparable reference here. We disagree. First, similar interpretative principles apply to constitutional and statutory enactments, whether enacted by voters or the Legislature. (See *Richmond v. Shasta Community Services Dist.* (2004) 32 Cal.4th 409, 418 [" 'The principles of constitutional interpretation are similar to those governing statutory construction.' [Citation.] The aim . . . is to determine and effectuate the intent of those who enacted the constitutional provision at issue."]; *People v. Rizo* (2000) 22 Cal.4th 681, 685 ["In interpreting a voter initiative . . . , we apply the same principles that govern statutory construction."].)[9] Second, while *Jahr* noted that it did not "make sense to read the term 'governing body' to include 'voters,' " citing the phrase "its members," (*Jahr, supra*, 70 Cal.App.4th at p. 1255), the court relied in the first instance on the clear language providing only for referendum. (*Id.* at p. 1254.) We address the governing body language in the development agreement statute, *post*.

We also reject Respondents' reliance on *VFRR*, which focused in part on whether a different provision of article XI, section 1(b), which governs compensation of county employees and contains no reference to challenging such compensation by referendum, precluded a referendum on county employee compensation. (*VFRR, supra*, 8 Cal.4th at p. 771; art. XI, § 1(b) ["[t]he governing body shall provide for the number, compensation, tenure, and appointment of employees"].) Pertinent here, the county and its amici argued

---

9    For similar reasons, we reject Respondents' attempt to distinguish on factual grounds other cases that Appellants cite for statutory interpretation principles. "The rules governing statutory construction are well settled." (*Burden v. Snowden* (1992) 2 Cal.4th 556, 562).

13

that the referendum language in the supervisor provision (i.e., the amendment) implied that referendum was unavailable as to employees. Amici appeared to reason that if all compensation decisions were already subject to referendum (such that referendums on employee compensation could be presumed), it would not have been necessary to include language on referendums for supervisors, and that such language would be surplusage. (*VFRR*, at pp. 771-772.)

The California Supreme Court disagreed, concluding that article XI, section 1(b), did not restrict the right of referendum on county employee compensation decisions. (*VFRR, supra*, 8 Cal.4th at p. 776.) In reaching this conclusion, the Supreme Court suggested reasons why the referendum language pertaining to supervisors' compensation may have been included in article XI, section 1(b), including that the Legislature may have "wish[ed] to emphasize . . . that the supervisors' salaries were subject to referendum" (given that they previously had been set by the Legislature) and to "give the referendum over supervisors' salaries an independent constitutional basis." (*VFRR*, at p. 773.) The Supreme Court determined that "[t]he most credible inference . . . is that neither the legislative drafters nor the electorate gave any consideration" to whether the voters had referendum power over salaries for "county employees other than the supervisors." (*Id.* at p. 774.)

Respondents contend that there is similarly no evidence that the Legislature "gave any consideration" to whether development agreements could be adopted by initiative. But here, as with the supervisor provision, there *is* a reference to referendum from which meaning can be gleaned. (See *Jahr, supra*, 70 Cal.App.4th at p. 1257 ["The portion of

14

article XI, section 1(b) at issue here expressly refers to the referendum power, and therefore escapes the claim of ambiguity raised in [*VFRR*]."].) Further, the Supreme Court's proposed reasons for the inclusion of referendum there does not impact our analysis here. The Supreme Court was focused on whether employee compensation was subject to referendum, not whether either determination could be accomplished through initiative. (*Chevron U.S.A., Inc. v. Workers' Comp. Appeals Bd.* (1999) 19 Cal.4th 1182, 1195 ["An opinion is not authority for propositions not considered."].) If anything, the Supreme Court's reasoning would support a restriction on initiatives for supervisor pay, and thus, would provide support for Appellants' position. It would be odd to emphasize only referendum, if initiative (and the power to actually set supervisor pay) were also available.

Respondents' other arguments are also unpersuasive. They contend that the right of initiative is broader than that of referendum, citing *Rossi v. Brown* (1995) 9 Cal.4th 688, 698 (*Rossi*) (noting limits on referendum, including not applying to "urgency statutes" or tax levies). Respondents do not elaborate on this point, but seem to be suggesting that the Legislature was merely emphasizing the availability of referendum in the development agreement statute, and not excluding initiative. We are not persuaded.[10] Respondents also cite section 65301.5, which provides that adoption or

---

10 Respondents do reference the limit on referendums for urgency legislation, in questioning why the County Supervisors Association requested that development agreements be subject to referendum. (See legislative history discussion in § B.4, *post*.) But Respondents do not contend that the Legislature's intent was to address this concern, or provide any argument or evidence for that position.

15

amendment of a general plan is a legislative act subject to legislative review. They argue that under Appellants' interpretation, the absence of a reference to initiative in that statute would mean that initiative was unavailable for general plans, and this is not the law. However, section 65301.5 is silent as to *both* initiative and referendum, and thus presumptively permits both. (*VFRR, supra*, 8 Cal.4th at p. 777.)

b. *Significance of the phrase "legislative body"*

The reference to "legislative body" in section 65876.5, subdivision (b), of the development agreement statute also supports our conclusion that the Legislature intended to exclusively delegate the approval of development agreements to the local legislative body.

"[W]hile [references to action by a local legislative body] are generally not conclusive as to legislative intent, they do support an inference that the intent was to preclude action by initiative or referendum . . . . [T]he strength of the inference varies according to the precise language used in the statute, a reference using generic language such as 'governing body' or 'legislative body' supporting a weaker inference than a specific reference to boards of supervisors and city councils." (*COST, supra*, 45 Cal.3d at p. 501.) Thus, the reference to "legislative body" in section 65867.5, subdivision (b) provides support for exclusive delegation.

2. *Statewide concern*

In *COST*, the California Supreme Court held that "an intent to exclude ballot measures is more readily inferred if the statute addresses a matter of statewide concern

16

rather than a purely municipal affair." (*COST, supra*, 45 Cal.3d at p. 501.) We conclude that the development agreement statutory scheme is of statewide concern.

We do not "automatically infer that a statutory scheme restricts the power of initiative or referendum merely because some elements of statewide concern are present." (*DeVita, supra*, 9 Cal.4th at pp. 780-781.) Rather, we "inquire concretely into the nature of the state's regulatory interests to determine if they are fundamentally incompatible with the exercise of the right of initiative or referendum, or otherwise reveal a legislative intent to exclusively delegate authority to the local governing body." (*Id.* at 781; see *id.* at p. 780 [Legislature's authority to restrict initiative or referendum "generally derives from its partial preemption of local government authority pursuant to the fulfillment of a state mandate or objective"].)

The development agreement statute was enacted to address a statewide impediment to land use development; namely, "[t]he lack of certainty in the approval of development projects" that resulted from the late vesting rule. (§ 65864, subd. (a); see Assem. Com. on Resources, Land Use, and Energy, Analysis of Assem. Bill No. 853 (1979-1980 Reg. Sess.) as amended May 10, 1979 ["the Governor's Housing Task Force has . . . recognized the 'development rights' problem as an impediment to housing construction in California."]; Dept. of Real Estate., Enrolled Bill Rep. on Assem. Bill No. 853 (1979-1980 Reg. Sess.) as amended Aug. 24, 1979 ["This bill would improve the process of development throughout the state."].)

The statute provided a solution to the problem by authorizing government assurances to developers that an approved project could proceed under current conditions.

17

(§ 65866.)  The Legislature found that these assurances would, among other things, "encourage private participation in comprehensive planning . . . ."  (§ 65864, subd. (b).) It also found that agreements could "include provisions . . . whereby applicants are reimbursed . . . for financing public facilities."  (§ 65864, subd. (c); see *Mammoth Lakes, supra*, 191 Cal.App.4th at p. 443 ["The Legislature recognized that . . . development agreements would provide benefits for both municipality and developer."].)  The state's interest is not limited to promoting development through mutually beneficial development agreements, but rather, extends to how such agreements are implemented. Development agreements are a creature of statute, and the various statutory requirements ensure that its goals are met.  (Cf. *VFRR, supra*, 8 Cal.4th at p. 781 [" 'salaries of local employees . . . constitute municipal affairs," but " 'the process by which salaries are fixed is obviously a matter of statewide concern' "].)[11]

Respondents first contend that development agreements, like other land use decisions, are matters of local concern.  We recognize that general plan amendments and

---

[11]    The state also has an interest in ensuring that development agreements do not lead to surrender of the police power.  (Cf. *Avco, supra*, 17 Cal.3d at p. 800 ["government may not contract away its . . . police power"]; see *SMART, supra*, 84 Cal.App.4th at pp. 232-233 [zoning freeze in development agreement was not surrender of police power, where, among other things, the agreement "retain[ed] the [c]ounty's discretionary authority" and was "not of unlimited duration," and "[t]he [c]ounty concluded that the zoning freeze . . . advances the public interest"; explaining that "[t]his type of action . . . is more accurately described as a legitimate exercise of governmental police power in the public interest than as a surrender of police power to a special interest."]; *Oakland Bulk & Oversized Terminal, LLC v. City of Oakland* (N.D.Cal., May 15, 2018, No. 16-cv-07014-VC) 2018 U.S. Dist. Lexis 81918 at pp. *66-*67 ["Although normally California public policy prohibits local governments from contracting away their right to exercise their 'police power' . . . the development agreement statute creates a limited exception to this rule."].)

18

zoning ordinances are local matters. (*DeVita, supra*, 9 Cal.4th at p. 774.) This is consistent with the authority for such decisions, which derives from a local government's "inherent police power, not from the delegation of authority by the state." (*Id.* at p. 782.) Planning and zoning laws are intended to provide minimal control, without changing the municipal nature of these decisions.[12] In contrast, the authority to enter into a development agreement derives from statute, and the statute is intended to address the statewide problem of uncertainty for developers resulting from late vesting, as discussed *ante*. (See *DeVita*, at p. 781 ["In some cases, exclusive delegation has been inferred as a means of promoting a particular regional project or intergovernmental relationship."]; cf. *id* at pp. 781-782 ["The amendment of a general plan, in contrast, is an act of formulating basic land use policy . . . ."].)

Second, Respondents argue that the Legislature exempted charter cities from the development agreement statute, which would reflect that development agreements are not a matter of statewide concern. The California Supreme Court has observed that "courts have never declared a matter to be of statewide concern despite an express legislative declaration that charter cities were not to be covered by the law in question." (*DeVita, supra*, 9 Cal. 4th at 783-784, italics omitted.) Respondents contend that the development

---

12    See section 65800 (intent in enacting ch. 4 (zoning regulations) was "to provide only a minimum of limitation in order that counties and cities may exercise the maximum degree of control over local zoning matters"); *DeVita, supra*, 9 Cal.4th at p. 783 (planning law "incorporates the state's interest in placing some minimal regulation on what remains essentially locally determined land use decisions"); see also *Yost v. Thomas* (1984) 36 Cal.3d 561, 572 (California Coastal Act "sets minimum standards" and "does not mandate the action to be taken by a local government in implementing local land use controls.").

agreement statute is in article 2.5 of chapter 4 of the Planning and Zoning Law (§ 65000 et seq.), and that section 65803 makes chapter 4 inapplicable to charter cities. (See § 65803 ["Except as otherwise provided, this chapter [four] shall not apply to a charter city, except to the extent that the same may be adopted by charter or ordinance of the city."].)

We are not persuaded. Even if one might infer that the placement of the development agreement statute in chapter four means that the Legislature intended to preclude its application to charter cities, there is no express legislative declaration to that effect. (See *Smith v. Doe* (2003) 538 U.S. 84, 94 ["manner of . . . codification" is probative of legislative intent, but not dispositive].) Moreover, it is not clear that charter cities would be able to enter into development agreements outside the statutory scheme, meaning that the statute could apply to them as a practical matter. But we need not resolve that issue.[13] It is sufficient to conclude that development agreements implicate statewide concerns and that the statutory language regarding charter cities does not conclusively establish otherwise.

---

[13] Because we do not decide whether the development agreement statute applies to charter cities, we deny Appellants' request for judicial notice of materials relating to the adoption of development agreement procedures by Los Angeles, a charter city. (See *Rowland, supra*, 4 Cal.4th at p. 268, fn. 6.) We do note that an Enrolled Bill Report identified as a problem that "[t]his new law should clearly apply equally to charter cities. [Assem. Bill No.] 853 places this new article in the Government Code so that it does not apply to charter cities." (Office of Planning and Research, Enrolled Bill Rep. on Assem. Bill No. 853 (1979-1980 Reg. Sess.) as amended Aug. 24, 1979, p. 3.) It is unclear whether the report viewed this placement as intentional or not—either way, it apparently viewed the placement as incorrect.

Third, Respondents contend that there is no reason to believe that the Legislature would have allowed referendum if it considered development agreements to be of statewide concern. But there may be circumstances where the Legislature finds it appropriate to limit only initiative, or referendum, but not both. (See *Jahr, supra*, 70 Cal.App.4th at p. 1259 [rejecting "suggestion the initiative power is corollary to the referendum power in all circumstances"]; *Meldrim, supra*, 57 Cal.App.3d at p. 344 [Legislature, in proposing constitutional provision regarding county supervisor salaries, may have viewed inflexibility of initiative process "to be contrary to the public welfare"]; *Rossi, supra*, 9 Cal.4th at pp. 693, 704 [prohibition on tax referenda did not preclude initiative to repeal a tax ordinance, explaining in part that "the potential for disruption of local government services by qualification of a referendum petition on a newly enacted tax measure is not present in the procedures leading to possible passage of an initiative which prospectively repeals an existing tax."]; see also *Newsom v. Board of Supervisors* (1928) 205 Cal. 262, 271, 274 (*Newsom*) [determining that toll bridge franchise could not be granted by initiative, but stating "it is not to be inferred" that the grant of a toll-bridge franchise "might not be . . . subject" to referendum, and expressing no opinion on the question].) We see no reason why the Legislature would be unable to exclusively delegate authority that limits only one of these powers, in appropriate circumstances.[14]

_____

[14]    In making the above point, Respondents note that the Legislature can adopt a pervasive system of regulation, thus precluding initiative and referendum, and suggest that the Legislature did not do so here. Pervasive regulation is not required in order to find exclusive delegation to the governing body. (*COST, supra*, 45 Cal.3d at p. 512 ["Where the legislative intent to delegate exclusively is otherwise clear, and the

21

Finally, Respondents make related arguments, contending that, without voter ability to adopt development agreements by initiative, there will be the "same uncertainties" that the Legislature tried to prevent and voters will be unable "to decide the fate of their community." We disagree. The statute provides a way to resolve these uncertainties, through local government approval. And voters retain their voice by participating in public hearings on agreements under consideration, voting in referendums on approved agreements, and voting in local government elections. (§§ 65867 [public hearing and notice of intention is required for adoption]; 65868 [notice of intention to amend is required]; 65867.5 [approval subject to referendum]; see *Jahr, supra*, 70 Cal.App.4th at p. 1255 [Court of Appeal was "reluctant to imply the right of initiative," given plain language on supervisor pay, "where article XI, section 1(b) adequately protects citizens' interests"; explaining that " '[t]he referendum is a powerful check on the power of the board of supervisors . . . .' We also note that voters are free to express their displeasure with individual supervisors at the ballot box."].)

3.      *Statutory scheme*

Appellants contend that the initiative process is inconsistent with "the fundamental concept of a development agreement as a negotiated contract" and would leave no way to ensure compliance with statutory requirements. We agree.

First, the development agreement statute contemplates negotiation between a local government and developer. It states that any city or county "may enter into a

legislation addresses a matter of statewide concern, the absence of a pervasive system of regulation is of no consequence."].)

development agreement with any person having a legal or equitable interest in real property for the development of the property . . . ." (§ 65865, subd. (a).) As discussed *ante*, the purpose of the statute is to encourage development by securing assurance for the developer and benefits for the municipality. (§ 65864; *Mammoth Lakes, supra*, 191 Cal.App.4th at p. 443; *SMART, supra*, 84 Cal.App.4th at p. 231.) Although the statute does not expressly require negotiation, it does contemplate party agreement on these matters. (Cf. *Rankin v. West American Ins. Co.* (1978) 84 Cal.App.3d 829, 834-835 [insurance statute "require[d] 'an agreement' " to delete uninsured motorist coverage; explaining that "[t]he word 'Agreement' implies a meeting of the minds of two or more identifiable parties"].) In turn, there must be a way for the parties to identify mutually acceptable terms, and this process typically is accomplished through negotiation. (See, e.g., *SMART*, at p. 225 ["[a]fter lengthy negotiations and a public hearing, the [c]ounty enacted an ordinance authorizing it to enter into the development agreement"]; *id.* at p. 231 [agreement "represent[ed] the resolution of a protracted dispute and balances the interests of all concerned parties"].)[15]

The initiative process does not contemplate negotiation, and cannot be changed before adoption, making it incompatible with the development agreement statute. If an initiative petition is signed by the requisite percentage of voters, "the legislative body shall do one of the following: [¶] (a) Adopt the ordinance, without alteration . . . . [¶]

---

[15] See also *Citizens for Responsible Gov't v. City of Albany* (1997) 56 Cal.App.4th 1199, 1219 ("negotiation of the 95-page development agreement . . . unquestionably involved the exercise of judgment and deliberation [by the city council], culminating in a decision to adopt an agreement with specific negotiated terms").

23

(b) Submit the ordinance, without alteration, to the voters . . . . [¶] (c) Order a report [regarding the effect of the initiative] . . . . When the report is presented to the legislative body, the legislative body shall either adopt the ordinance . . . or order an election pursuant to subdivision (b)." (Elec. Code §§ 9215 [city]; see 9118 [county].) (See *Amador Valley Joint Union High Sch. Dist. v. State Bd. of Equalization* (1978) 22 Cal.3d 208, 228 [" '[T]he initiative is in essence a legislative battering ram which may be used to tear through the exasperating tangle of the traditional legislative procedure and strike directly toward the desired end . . . . It is deficient as a means of legislation in that it permits very little balancing of interests or compromise, but it was designed primarily for use in situations where the ordinary machinery of legislation had utterly failed in this respect."].)

By way of contrast, the initiative process is consistent with planning and zoning changes, which do not require negotiation, and those changes generally are subject to initiative. (*DeVita, supra*, 9 Cal.4th at pp. 770-771, 774.) The governing body takes action after public hearings (*Beck Development Co. v. Southern Pacific Transportation Co.* (1996) 44 Cal.App.4th 1160, 1195-1196), or the public takes action through the initiative. Although stakeholders like developers may participate, the purpose is not to reach a binding agreement with them, and there is thus no implied need for negotiation.

Respondents argue that the agreement here was negotiated, and also that "the negotiation process effectively goes on during the initiative process." We recognize that the agreement here is substantively similar to the version that was negotiated by Highland Fairview and the City, but nothing in the initiative process would require such

24

negotiation. As for Respondents' claim that negotiation occurs during that process, they suggest that voters have the ability to give or withhold support for a development agreement initiative. This is not negotiation in any meaningful sense. Respondents also contend that because the agreement at issue was negotiated, a ruling that development agreements must be negotiated would be an improper advisory opinion. We make no such ruling. Rather, we examine the role of negotiation in determining whether the statute precludes approval by initiative—the issue that is squarely before us.

Second, Appellants contend that a development agreement adopted by initiative cannot ensure municipal compliance with the statutory provisions, including "ongoing monitoring and, where necessary, modification or termination of a development agreement." These concerns are well founded. The development agreement statutory scheme is integral to its purpose and effective operation. A development agreement involves commitments by a government and developer, with respect to a particular project. (See *SMART, supra*, 84 Cal.App.4th 221, 230 [development agreement statute is "limited to actual projects"].) The statutory requirements ensure that agreements contain certain terms; that developer commitments are being met (and that, if they are not, the agreement can be terminated); and that the parties generally have a say in amendment. (See §§ 65865.2 [required terms], 65865.1 [at least annual review for good faith compliance, with termination or modification possible for noncompliance], 65868 [amendment or cancellation "by mutual consent"].) If development agreements could be

adopted by initiative, developers could obtain vested rights, without fulfilling the corresponding commitments envisioned by the statute.[16]

Respondents note that the development agreement in this case includes review and termination provisions, and argue that if a development agreement conflicted with the statute, it would be invalid. But voluntary inclusion of those terms here does not mean that an initiative-adopted development agreement is required to include them. *Lesher Communications, Inc. v. City of Walnut Creek* (1990) 52 Cal.3d 531, cited by Respondents, does not establish otherwise. There, the California Supreme Court held that a zoning ordinance that conflicted with the general plan was void. (*Id.* at p. 544; see § 65860 [zoning "must be consistent with the general plan"].) But planning and zoning changes adopted by initiative are not required to comply with all applicable requirements. (*Citizens for Planning Responsibly v. County of San Luis Obispo* (2009) 176 Cal.App.4th 357, 375 ["Statutory procedural requirements governing the adoption and amendment of

---

16    Respondents suggest that voters "may well be willing" to provide assurances "without any further promises from the developer." Voters approving a development agreement presumably would want the developer to be accountable, at a minimum, for building the proposed project at issue. The parties also dispute whether *Newsom, supra*, 205 Cal. 262, offers guidance here. It does. There, the California Supreme Court determined that an initiative could not be used to grant a toll bridge franchise, explaining that the intermingled legislative, administrative, and quasi-judicial functions of the board of supervisors under the toll-bridge franchise law "render[ed] the operation of such law entirely inconsistent and unworkable with the initiative law." (*Id*. at p. 271.) The board functions included taking testimony at public hearings and exercising discretion in granting franchises. (*Id.* at p. 270; see *id.* at p. 271 [noting that initiative "must . . . be adopted without alteration" and "there is no discretion vested in the board to make its provisions . . . conform to the facts required" for a valid franchise].) Although *Newsom* described toll-booth regulations as "in a class by themselves" (*id.* at p. 266), the decision illustrates how a statute can, as here, be incompatible with the initiative process.

26

zoning ordinances and general plans generally do not apply to initiatives."].)  Even if a development agreement adopted by initiative would be void for failure to comply with the general plan, it does not necessarily follow that failure to include review and termination provisions would also render it void.

4.  *Legislative history*

The legislative history of the development agreement statute is consistent with an intent to exclusively delegate the adoption of development agreements to local governing bodies and to render them subject to referendum, but not initiative.

a.  *Enactment of the development agreement statute*

The development agreement statute was enacted by Assembly Bill No. 853 (Reg. Sess. 1979-1980).  The original version of section 65867.5 stated that a "development agreement shall be approved by ordinance."  (Assem. Bill No. 853 (1979-1980 Reg. Sess.) as introduced March 12, 1979.)  The text was modified before passage to state that a "development agreement is a legislative act which shall be approved by ordinance and is subject to referendum."  (Stats. 1979, ch. 934, § 1.)  This modification suggests that the addition of only referendum—and the omission of initiative—was intentional.  Further, multiple documents in the legislative history note that a development agreement would be subject to referendum, while remaining silent as to initiative.  (Cf. *Jahr, supra*, 70 Cal.App.4th at p. 1256 [noting in part that ballot materials "use[d] the term 'referendum' five times, but [did] not mention the term 'initiative' "].)

Appellants also direct us to (i) a letter from the County Supervisors Association of California to the sponsoring assemblyman, requesting that development agreements be

subject to referendum, and (ii) and a letter from the League of California Cities to the governor, indicating that the bill incorporated amendments responding to their concerns (together with an excerpt from a document by the League of California Cities, noting that "[m]any city officials feared that the development agreement concept would lead to irresponsible decisions . . . ."). We recognize that letters may be of limited relevance in assessing legislative history, but these materials do suggest that "subject to referendum" was included to resolve a particular concern, not simply to emphasize that referendum was available.[17]

> b. *Recent legislative history*

We separately address recent legislation cited by Respondents, Assembly Bill No. 890, which passed the Legislature in 2017, but was vetoed by the governor. (Assem. Bill No. 890 (2017-2018 Reg. Sess.); Assem. Bill No. 890.) Respondents contend that the bill sought to add a provision "prohibit[ing] the adoption of a development agreement

---

[17] (Compare, e.g., *Kaufman & Broad Communities, Inc. v. Performance Plastering, Inc.* (2005) 133 Cal.App.4th 26, 37-38 [letters generally not part of legislative history], with, e.g., *In re York* (1995) 9 Cal.4th 1133, 1144 [considering letter from Attorney General to bill's author]; *Travelers Indem. Co. v. Gillespie* (1990) 50 Cal.3d 82, 96 [letters sent to governor indicated provision at issue "was enacted in response" to a case].) Appellants also cite *216 Sutter Bay Associates v. County of Sutter* (1997) 58 Cal.App.4th 860, which affirmed a board of supervisors' rescission of a development agreement approved by the outgoing board. (*Id*. at p. 864.) The court noted: "One land-use law commentator has noted that the 'legislative act' and 'referendum' provisions of section 65867.5 . . . were placed in the statute 'to avoid such problems as a "lame duck" city council approving a development agreement opposed by the people.' " (*Sutter*, at p. 872, fn. 2, quoting Strom, 1982 Zoning and Planning Law Handbook, Development Agreements, § 11.03[7], p. 185.) But *Sutter* does not identify the legislative history relied upon by the treatise and, although the rationale is plausible (and consistent with the letters discussed *ante*), we cannot ascribe it to the Legislature on this record.

28

through the initiative process" and is thus "evidence that the action was allowed."  As an initial matter, we reject Appellants' assertion that this legislation has no bearing on legislative intent.  (*Freedom Newspapers, Inc. v. Orange County Employees Retirement System* (1993) 6 Cal.4th 821, 832 ["The Legislature's adoption of subsequent, amending legislation that is ultimately vetoed may be considered as evidence of the Legislature's understanding of the unamended, existing statute."].)  However, we disagree that this bill reflects that development agreements may be adopted by initiative.

The bill indicates that the Legislature was concerned with preventing avoidance of "enforceable environmental review . . . ."  (Assem. Bill No. 890.)  It stated, in part, that "[i]t is the intent of the Legislature to clarify that development agreements, which are negotiated contractual agreements between a legislative body and an individual or entity, are unsuitable for the initiative process." (*Ibid.*)  It also stated, "[t]his act addresses a matter of statewide concern and therefore shall apply equally to all cities and counties, including charter cities." (*Ibid.*)  The bill proposed certain changes to general plan, specific plan, and zoning ordinance adoption and approval.  It also proposed to add a new subdivision (b) to section 65867.5, stating:  "A development agreement cannot be approved or amended by an ordinance adopted through the initiative process.  This subdivision shall apply to a charter city." (*Ibid.*)

Respondents imply that the proposed addition to section 65867.5 was a change in law, which would reflect that initiative is permitted under the existing statute.  But, significantly, the Legislature expressly stated that it was "clarify[ing]" that development agreements, which are "negotiated contractual agreements," are "unsuitable" for

29

initiatives. The Legislature's use of the term "clarify" is meaningful. (See *City of Redlands v. Sorensen* (1985) 176 Cal.App.3d 202, 211 ["the enactment of . . . an amendment to a statute for the purpose of clarifying preexisting law or making express the original legislative intent is not considered a change in the law; . . . it simply states the law as it was all the time"]; see also *Lone Star Security & Video, Inc. v. Bureau of Security & Investigative Services* (2009) 176 Cal.App.4th 1249, 1256 [declaration by Legislature that amendment is declaratory of existing law is not binding on a court, but is "a factor entitled to due consideration," citing *McClung v. Employment Development Dept.* (2004) 34 Cal.4th 467].) Here, the Legislature's reference to "negotiated contractual agreements" suggests that it is the inherently contractual nature of development agreements that renders them unsuitable for the initiative process. Thus, read in context and in light of the statutory scheme, the only reasonable interpretation of "clarify" is that that the amendment barring approval by initiative was a clarification of the law, not a change to it.

The concern regarding development agreements being unsuitable for the initiative process would apply equally to charter cities (suggesting a reason for the express reference to them in proposed subdivision (b), and supporting the view that they were already subject to the statute). Finally, we do not view the bill's statement about its subject matter being of statewide concern as implying that the underlying matters were necessarily previously of local concern only.

Thus, to the extent that this legislation is relevant, it further reflects that the Legislature intended to preclude adoption of development agreements by initiative, and

30

supports our conclusion that the Legislature intended to exclusively delegate to local legislative bodies the authority to approve development agreements.

C.    *Conclusion*

We are sensitive to our duty to guard the right of initiative, and to resolve doubts in its favor. However, we are also required to ascertain the intent of the Legislature. There is clear evidence that the Legislature intended to exclusively delegate approval of development agreements to governing bodies and to preclude the right of initiative. We conclude that the trial court erred by denying Appellants' petitions.

IV

DISPOSITION

The judgment is reversed. The trial court is directed to grant Appellants' petitions and to issue a writ of mandate directing the City Council for the City of Moreno Valley to set aside its adoption of the World Logistic Center Development Agreement Initiative. Appellants are awarded their costs on appeal.

AARON, J.

WE CONCUR:

HUFFMAN, Acting P. J.

HALLER, J.

31