Filed 4/13/21  Blakemore v. Bruce CA4/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

**IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA**

**FOURTH APPELLATE DISTRICT**

**DIVISION TWO**

| | |
|---|---|
| MICHELE D. BLAKEMORE, as County Counsel, etc., | E074127 |
| Plaintiff and Respondent, | (Super.Ct.No. CIVDS1802537) |
| v. | OPINION |
| GAGE BRUCE, | |
| Defendant and Appellant. | |

APPEAL from the Superior Court of San Bernardino County.  David Cohn, Judge.  Affirmed.

The Red Brennan Group and Aaron D. Burden for Defendant and Appellant.

Michelle D. Blakemore, County Counsel, and Laura Crane, Deputy County Counsel, for Plaintiff and Respondent.

In 2019, we affirmed a judgment excusing the San Bernardino County Counsel's office from the duty to prepare ballot titles and summaries for six initiatives proposed by Gage Bruce and David Gates.  (*Gates v. Blakemore* (2019) 39 Cal.App.5th 32, 34, 40

1

(*Gates*).)  While that appeal was pending, Mr. Bruce submitted notices of intent to circulate for signatures four new initiatives (Nos. 9, 10, 11, & 12) to the San Bernardino County Registrar of Voters.  In response, the county counsel's office initiated this action for declaratory relief.  The trial court entered judgment for the county counsel's office, ruling that the new initiatives are invalid and relieving county counsel of its duty to prepare ballot titles and summaries.  Mr. Bruce appeals, contending the trial court erred (1) by excusing the county counsel's office from its ministerial duty in order to allow it to engage in preelection review of the initiatives instead, (2) by determining initiatives Nos. 9, 10, 11, and 12 were invalid, and (3) by not addressing his fundamental right to free speech.  Finding no error, we affirm.

## II.  PROCEDURAL BACKGROUND AND FACTS

### A.  *Related Action* (*Super. Ct. Riverside*, *case No. CIVDS 1723296*).

"In 2017, David Gates and Gage Bruce submitted to the San Bernardino County Registrar of Voters notices of intent to circulate for signatures with respect to nine initiatives.  The initiatives were referred to county counsel for preparation of ballot titles and summaries.  (See Elec. Code, § 9105, subd. (a).)  County counsel prepared ballot titles and summaries for two of the initiatives, and a third initiative was withdrawn.  Litigation ensued with respect to the remaining six initiatives, . . .  Initiatives 1, 2, 5, 6, 7, and 8."  (*Gates*, *supra*, 39 Cal.App.5th at pp. 34-35.)  Judicial review of these six initiatives resulted in the trial court finding them to be invalid and, thus, excusing county counsel from preparing a ballot title and summary since they could not be placed on the ballot.  (*Id*. at p. 37.)  We affirmed the trial court's decision, finding "Initiatives 1, 2, 5, 6,

2

and 7 each exceed the initiative power of the electorate by intruding on budgetary matters that are exclusively within the authority of the board of supervisors. Initiative 8 (and the corresponding portion of Initiative 2 that it duplicates) would restructure the County's government in a manner that violates the Government Code." (*Id*. at p. 38.)

Relevant to the current action is initiative No. 2, which is entitled, "'The San Bernardino County Charter Accountability Measure.'" (*Gates*, *supra*, 39 Cal.App.5th at p. 35.) Initiative No. 2's "stated purpose is to 'assure that the business of the County of San Bernardino is conducted in an open and responsible manner that is fiscally sound and that the Board of Supervisors through its Chair are held to account for the actions taken on behalf of the County.' If enacted, it would make revisions to the County's charter and code of ordinances that can be grouped into four broad categories. One category is changes to the structure of the County government. The initiative would, among other things, eliminate the current chief executive officer position, providing instead that the chair of the board of supervisors shall be 'the general executive agent of the Board.' The chair would be assisted in this executive role by a newly created 'County Administrative Officer.' The chair's new responsibilities would include preparing, 'in coordination with the County Administrative Officer and the County Auditor,' the annual County budget. In performing this duty, the chair would be charged with reviewing 'all departmental and agency requests and all items in the proposed budget . . . .'" (*Ibid*.)

"A second category of revisions that would be made by Initiative 2 is a limitation on budget expenditures for board members. Specifically, the 'total annual budget for each Member of the Board of Supervisors'—defined to include 'all office operations . . .

3

including staff member salaries, office equipment, rent, vehicle allowances, credit cards, health insurance, life insurance, leave and portable communication devices,' but not to include the board member's own compensation—would not be permitted to 'exceed five (5) times the annual compensation amount for each Member . . . .'" (*Gates*, *supra*, 39 Cal.App.5th at pp. 35-36.)

"Third, Initiative 2 would limit the compensation of elected County officials. It provides that the 'annual compensation (including salary and benefits)' of members of the board of supervisors 'shall be equal to, and shall never exceed, the median household income in San Bernardino County . . . .' The annual compensation of the chair of the board, as well as other 'Elected County Officials' whose compensation is set by the board, would be limited to three times the median household income in San Bernardino County. Also, any new or reelected 'elected official[s] serving San Bernardino County' would not receive any 'retirement benefits that extend beyond the term of the office holder,' and current elected officials would 'retain any retirement benefits already accrued and vested while in office,' but neither the County nor the official would make any further contributions once the current term of the official expires." (*Gates*, *supra*, 39 Cal.App.5th at p. 36.)

"Finally, Initiative 2 would place restrictions—both maximums and minimums—on the number of certain County employees. It would limit '[t]he total number of county elected, appointed, or other public officials or employees paid by the County . . . [to] one county employee for every 108 residents in the County of San Bernardino.' It would also require the County to 'ensure the ratio of patrol deputies to "citizens served"' be at least

4

one deputy for every 1,398 residents, defining the term "'citizens served'" to mean 'the population of the county in all areas where the County Sheriff provides primary law enforcement patrol duties, excluding cities/areas where the Sheriff provides primary law enforcement patrol duties via contract.'" (*Gates*, *supra*, 39 Cal.App.5th at p. 36.)

*B. The Current Action.*

In early 2018, Mr. Bruce divided initiative No. 2 into four new initiatives, changing and/or adding language not addressed in the related action but essentially offering similar amendments to the charter as provided in initiative No. 2. On January 16, 2018, he submitted notices of intent to circulate for signatures initiatives Nos. 9, 10, and 11 to the registrar of voters' office, and on February 26, 2018, he submitted a notice of intent to circulate for signatures initiative No. 12.

Initiative No. 9 is entitled, "Initiative to Set Compensation Limits, Cease Retirement Benefits, and Limit Staff Size and Cost for Members of the County Board of Supervisors." Its stated purpose is "to 1) make the position of elected Supervisor a part-time position, 2) adjust compensation to reflect part-time status, 3) cease the accrual of retirement benefits for County Supervisors, 4) require the staff budget for each Supervisor to be set at $500,00 per year, [and] 5) require staff positions that support County Supervisors be drawn from the County Classified Service."

Initiative No. 10 is entitled, "Initiative to Set Compensation Limits and Limit Staff Size and Cost for Members of the County Board of Supervisors." Its stated purpose is "to 1) make the position of elected Supervisor a part-time position, 2) adjust compensation to reflect part-time status, 3) require the staff budget for each Supervisor to

5

be set at $500,000 per year, [and] 4) require staff positions that support County Supervisors be drawn from the County Classified Service."

Initiative No. 11 is entitled, "The Initiative to Limit San Bernardino County Supervisor Staff Size and Cost." Its stated purpose is "to avoid the potential for a political patronage system via County Supervisor staffing." To that end, initiative No. 11 "requires the staff budget for each Supervisor to be set at $500,000 per year, . . . adjusted with reference to the Bureau of Labor Statistics Consumer Price Index[, and] positions supporting County Supervisors be staffed with personnel from the County Classified Service."

Initiative No. 12 is entitled, "Initiative to Set Compensation Limits and Adjust Staff Support for Members of the County Board of Supervisors." Its stated purpose is to address the board of supervisors' "disengage[ment] from hands-on leadership" and "allow[ance of] the size of County government to grow without constraints." To that end, initiative No. 12 requires the "position of County Supervisor shall be considered a part-time position" with a "total compensation" of "five thousand dollars ($5,000.00) per month" (including salary and benefits), subject to annual increases based on the cost of living, "not to exceed five percent (5%) per year." The compensation may only be changed "by a vote of the people at the time of a general election." Also, initiative No. 12 requires the total annual budget of each board member "shall not exceed five (5) times the annual compensation amount for each member as provided in Article VI, Section 1," as amended herein.

6

Additionally, initiative Nos. 9, 10, and 11 sought to add article VI, section 6, which would limit "staffing expenses" to "$500,000 per supervisor on an annual basis" and require all "County Supervisor support staff positions . . . be filled with personnel from the County Classified Service." Initiative Nos. 9, 10, and 12 sought to amend article I, section 1, to recognize that the "<u>position of County Supervisor shall be considered a part-time position</u>."

The county counsel's office reviewed and analyzed each initiative and determined that, as written, they were invalid because they: (1) "are not legislative in nature," (2) "encroach on matters of statewide concern and therefore are not properly the subject of an initiative," (3) "infringe on matters exclusively reserved by the California Constitution to the County of San Bernardino Board of Supervisors," (4) "contain provisions that conflict with California constitutional and statutory law," (5) "interfere with essential government functions," (6) "set forth arbitrary standards," and (7) are "unconstitutionally vague." County counsel asserted that since the initiatives are invalid, to provide "a ballot title and summary" "would be misleading to the electorate, and would result in voter confusion and fiscal inefficiencies." Thus, on January 31, 2018, the county counsel's office initiated this action, seeking declaratory relief. After finding that the initiatives were invalid, the trial court entered judgment excusing the county counsel's office from its duty pursuant to Elections Code section 9105, subdivision (a), to prepare a ballot title and summary for the initiatives on the ground that each is "invalid and may not be placed on the ballot." Mr. Bruce appeals.

7

## II. DISCUSSION

### A. *Preelection Review of Initiatives.*

To begin with, Mr. Bruce challenges the propriety of excusing the county counsel's office from its ministerial duty to provide a ballot title and summary (Elec. Code, § 9105, subd. (a))[1] in order to allow preelection judicial review of his initiatives. Because he "fails to establish that 'prepetition' review of his initiative measures is constitutionally proscribed" (*Widders v. Furchtenicht* (2008) 167 Cal.App.4th 769, 781), we reject his challenge. (*Gates*, *supra*, 39 Cal.App.5th at p. 38.)

As we have recognized, "[i]t is 'usually more appropriate to review constitutional and other challenges to ballot propositions or initiative measures after an election rather than to disrupt the electoral process by preventing the exercise of the people's franchise,' but this is true only 'in the absence of some clear showing of invalidity.' [Citation.] It is 'well accepted that preelection review of ballot measures is appropriate where the validity of a proposal is in serious question, and where the matter can be resolved as a matter of law before unnecessary expenditures of time and effort have been placed into a futile election campaign.'" (*Gates*, *supra*, 39 Cal.App.5th at p. 38.)

Nonetheless, Mr. Bruce argues that preelection review of a proposed initiative measure is limited to those cases "where the alleged invalidity arises from the form of the

---

[1] Election Code, section 9105, subdivision (a), in relevant part, provides: "The county elections official shall immediately transmit a copy of any proposed measure to the county counsel. Within 15 days after the proposed measure is filed, the county counsel shall provide and return to the county elections official a ballot title and summary for the proposed measure. . . ."

proposed measure." Because the alleged invalidity in this case "arises from the substance of the proposed measure," he contends "preelection review is not appropriate." To explain this difference, he cites *Costa v. Superior Court* (2006) 37 Cal.4th 986 (*Costa*). In that case, the legal challenge did not involve "the substantive validity of the initiative measure but rather . . . a procedural claim pertaining to the preelection petition-circulation process." (*Id*. at p. 1006.) Our Supreme Court observed: "[B]ecause the question at issue . . . is whether the initiative measure has satisfied the constitutional or statutory procedural prerequisites necessary to qualify it for the ballot, it is logical and appropriate for a court to consider such a claim prior to the election, because if the threshold procedural prerequisites have not been satisfied the measure is not entitled to be submitted to the voters. Unlike a challenge to the substantive validity of a proposed measure, it cannot properly be suggested that it would be premature to consider such a claim prior to the election, because the focus of the issue is solely upon whether the measure has qualified for the ballot, and not upon the validity or invalidity of the measure were it to be approved by the voters." (*Ibid*.)

Although *Costa*, *supra*, 37 Cal.4th at page 1005, establishes that it is more appropriate, in general, to review challenges to initiative measures after an election, the court has also deemed it appropriate in some instances—for instance, when a substantial question has been raised regarding the proposition's validity, and the "hardships from permitting an invalid measure to remain on the ballot" outweigh the harm potentially posed by "delaying a proposition to a future election"—to conduct a preelection judicial review. (*Howard Jarvis Taxpayers Assn. v. Padilla* (2016) 62 Cal.4th 486, 494 [Prop. 49

9

withheld from ballot to allow judicial review of the proposition's validity]; see *id.*, at pp. 496-497; accord, *American Federation of Labor v. Eu* (1984) 36 Cal.3d 687, 697 [granting preelection relief when initiative measure violated article V of the federal Constitution and exceeded the scope of the initiative power].)  This is such a case.

Here, the initiatives primarily involve issues (limiting board member benefits or budgets) that were directly addressed in the related action and found to be invalid. (*Gates*, *supra*, 39 Cal.App.5th at pp. 39-40.)  The remaining novel issues involve reclassifying the position of county supervisor and limiting each board member's control over staff and expenses.  Because the subject matter of these novel issues—arguably similar to the subject matter previously struck down—raises significant questions regarding the initiatives' validity, "it was proper for [county counsel] to initiate its declaratory relief action as a means of disputing, in a preelection challenge, [their] validity."  (*City of Riverside v. Stansbury* (2007) 155 Cal.App.4th 1582, 1591, abrogated in part on another ground as stated in *Mission Springs Water Dist. v. Verjil* (2013) 218 Cal.App.4th 892, 899; see *City of San Diego v. Dunkl* (2001) 86 Cal.App.4th 384, 389 ["[P]reelection review of ballot measures is appropriate where the validity of a proposal is in serious question, and where the matter can be resolved as a matter of law before unnecessary expenditures of time and effort have been placed into a futile election campaign."].)

B.  *Validity of Initiative Nos. 9, 10, 11, and 12.*

Mr. Bruce contends that the trial court erred by determining initiative Nos. 9, 10, 11, and 12 were invalid.  We disagree.

10

"[T]he people's power to propose and adopt initiatives is at least as broad as the legislative power wielded by the Legislature and local governments." (*California Cannabis Coalition v. City of Upland* (2017) 3 Cal.5th 924, 935; see, e.g., *DeVita v. County of Napa* (1995) 9 Cal.4th 763, 775 (*DeVita*) [discussing local right to initiative].) "'[T]he local electorate's right to initiative and referendum is guaranteed by the California Constitution, article II, section 11 . . . .' [Citation.] Authority over certain matters, however, is delegated 'exclusively to the governing body, thereby precluding initiative and referendum.'" (*Gates*, *supra*, 39 Cal.App.5th at p. 38.) As relevant here, "[t]he California Constitution expressly reserves for the 'governing bodies' of charter counties the authority to set the number of county employees, their duties, and their compensation. (Cal. Const., art. XI, § 4, subd. (f).)[2]" (*Gates* at p. 39.)

To the extent initiative Nos. 9, 10, 11, and 12, offer similar amendments to the charter as previously provided in initiative No. 2—limiting retirement benefits[3] and the board of supervisors' authority to set the compensation of certain county employees—they are invalid. (*Gates*, *supra*, 39 Cal.App.5th at pp. 39-40; *County of Sonoma v.*

---

[2] "County charters shall provide for: [¶] . . . [¶] (f) The fixing and regulation by governing bodies, by ordinance, of the appointment and number of [employees], and for the prescribing and regulating by such bodies of the powers, duties, qualifications, and compensation of such persons, the times at which, and terms for which they shall be appointed, and the manner of their appointment and removal. (Cal. Const., art. XI, § 4.)" (*Gates*, *supra*, 39 Cal.App.5th at p. 39, fn. 4.)

[3] Pension benefits are a vital component of an employee's compensation. "'[T]he fixing of the number of employees, the salaries and *employee benefits* is an integral part of the statutory procedure for the adoption of the county budget . . . .'" (*County of Sonoma v. Superior Court* (2009) 173 Cal.App.4th 322, 343, italics added.)

*Superior Court*, *supra*, 173 Cal.App.4th at pp. 342-343 [The fixing of the salaries of county employees falls "within the legislative powers of a county board of supervisors."].)  Likewise, to the extent the novel issues identified in the initiatives seek to place limits on the board of supervisors' authority to appoint certain county employees, namely their support staff, or reclassify the position of county supervisor, the initiatives are invalid because they infringe on authority exclusively delegated to the board of supervisors by the California Constitution.  (Cal. Const., art. XI, § 4, subds. (b), (e).)[4]

Notwithstanding what we have stated *ante*, Mr. Bruce asserts that the "statutory language at issue supports a weak inference that the grant of power is exclusive[; however,] the inclusion of the term 'governing bodies' must be read as including the electorate and their constitutional right to initiative, which is coextensive with the legislative power of the Board of Supervisors."  Not so.  The California Constitution defines the "governing body" of a county as consisting of "5 or more members, elected (1) by district or, (2) at large, or (3) at large, with a requirement that they reside in a district."  (Cal. Const., art. XI, § 4, subd. (a).)  "If the language is clear, there can be no room for interpretation; effect must be given to the plain meaning of the words." (*Building Industry Assn. v. City of Camarillo* (1986) 41 Cal.3d 810, 818 [controversy concerned the term "'governing body'" in Evid. Code, § 669.5, subd. (a), and the reference in subd. (d) to matters adopted by initiative]; see *Teachers Management & Inv.*

---

[4] "County charters shall provide for:  [¶] . . . [¶]  (b) The compensation, terms, and removal of members of the governing body. . . . [¶] . . . [¶]  (e) The powers and duties of governing bodies . . . ."  (Cal. Const., art. XI, § 4, subds. (b), (e).)

*Corp. v. City of Santa Cruz* (1976) 64 Cal.App.3d 438, 446 ["In general, a court should not look beyond the plain meaning of a statute when its language is clear and unambiguous, and there is no uncertainty or doubt as to the legislative intent."].) Given the clear language in the California Constitution, the term "'governing body'" excludes the electorate. (*Building Industry Assn. v. City of Camarillo*, at p. 818; see *Riedman v. Brison* (1933) 217 Cal. 383, 387 [construing reference in the Metropolitan Water District Act to the "'*governing body*'" barred an initiative to withdraw a city from regional metropolitan water district].)

Considering our conclusions *ante*, we need not address the arguments regarding other possible bases for finding the proposed initiatives invalid. Mr. Bruce has not demonstrated any error in the trial court's ruling.

### C. Right to Free Speech.

Finally, Mr. Bruce asserts that the trial court erred by not addressing his fundamental right to free speech. We disagree. "'[W]hile the right of free speech is one of the most precious rights to citizens of a free and open society, it is not without limit when the state Constitution provides it with a special forum for an initiative process in which voters are asked to sign a petition which ultimately may impact the community.'" (*Widders v. Furchtenicht*, *supra*, 167 Cal.App.4th at p. 780; see *City of Riverside v. Stansbury*, *supra*, 155 Cal.App.4th at p. 1592 [rejecting initiative proponent's contention that he had "an unfettered right to circulate a petition and to present it to the sovereign" because "there is no constitutional right to place an *invalid* initiative on the ballot"].)

13

## III.  DISPOSITION

The judgment is affirmed.  Respondent is awarded costs on appeal.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

McKINSTER_____
Acting P. J.

We concur:


FIELDS_____
J.


RAPHAEL_____
J.

14